REDDING *v.* BOARD OF COUNTY COMMISSIONERS FOR PRINCE GEORGE'S COUNTY, MARYLAND

[No. 484, September Term, 1970.]

*Decided October 14, 1971.*

*Motion for rehearing filed November 11, 1971; denied November 17, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SINGLEY and SMITH, JJ.

*Fred R. Joseph,* with whom were *Karl G. Feissner, William L. Kaplan, Thomas P. Smith, Andrew E. Greenwald, Walter E. Laake* and *Feissner, Kaplan & Smith* on the brief, for appellant.

*Glenn T. Harrell, Jr.,* and *John R. Barr, Associate County Attorneys,* with whom was *Walter H. Maloney, Jr., County Attorney,* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

The question presented to us in this appeal is whether the Circuit Court for Prince George's County (McCul-

lough, J.) erred in passing an order on January 4, 1971, declaring an order of the Board of Administrative Appeals for Prince George's County (Board of Appeals), dated June 22, 1970, null and void. The Board of Appeals had, on March 13, 1970, by a vote of two to one, sustained the findings of the Chief of Police dismissing the appellant, Michael D. Redding, from the police force of the county. Later, on the motion of Redding, the Board of Appeals granted a rehearing which was held on May 18, 1970, and thereafter reinstated Redding as a county police officer upon the payment of a $200 fine with suspension for three months from the time of his original dismissal by the Chief of Police.

Vincent S. Free, Chief of Police of the Police Force of Prince George's County (Chief Free), notified Redding on December 30, 1969, to appear before the Police Trial Board on January 6, 1970, to answer two charges against Redding, as follows:

"(1) Section 15-14-C-12 Conduct unbecoming an officer on December 20, 1969; wherein you [did] fail to conduct yourself in such a manner as would redound to the credit of the Department.

"(2) Section 15-14-C-20 You did intentionally violate a law of the State of Maryland, in that you did take, steal, and carry away and convert to your own use one (1) racing type jacket, valued at $8.97, the property of Zayre Corporation."

After a hearing the Trial Board found Redding not guilty of charge (2) but guilty of charge (1). It recommended to Chief Free that Redding be dismissed from the force. On January 12, 1970, Chief Free notified Redding of the action of the Trial Board and that he concurred in its recommendation that Redding be dismissed from the force. Chief Free also notified Redding that he had five days within which to appeal to the Board of Appeals. Redding took an appeal through counsel and a

hearing before the Board of Appeals was held on March 2, 1970. At this hearing all three members of the Board of Appeals were present, *i.e.*, William G. Fawsett, Chairman; Simon M. Pristoop, Vice Chairman and Robert S. Miller, Member. Also present were the following counsel:

Martin A. Hertz, Assistant County Attorney, Counsel for the Police Department,

Robert J. Flynn, Counsel for the Board of Appeals,

Fred R. Joseph, Counsel for Redding.

Mr. Flynn stated on behalf of the Board of Appeals that the procedure to be followed was that counsel for the Police Department would introduce into evidence a tape recording of the proceedings before the Trial Board, the findings of fact by the Trial Board and a summary of evidence—that is, all of the testimony before the Trial Board. He further stated that if counsel for the Police Department wished to put on additional evidence, he could do this; and counsel for Redding could put on whatever defense he might have.

Then the following appears in the record:

"MR. JOSEPH: Mr. Chairman, in regard to the question of stipulations, may I state at the outset that Officer Redding wants to facilitate matters here as much as possible; get them over with. We have no intention whatsoever of complicating the proceedings. However, it is our feeling that the burden is still upon the County, upon the police, in this case, and that with that burden goes the necessity that they prove their case.

"Now, there were certain witnesses brought before the Trial Board, Police Board. It is my opinion that a reading of what the police or the County Attorney recalls their statement to be does not present the evidence in the light of that hearing. I think in judging the weight of cer-

tain testimony it is necessary to see the individuals and hear from them in person. I state this in regard, most specifically, to the, so to speak, accusing representative of the Zayre's Store, Mr. Friedhoff, who I think does not come out nearly as bad from the reading of the Findings of Fact as he did at the Trial Board.

"So I would state I would be willing to make certain stipulations. I do not, however, stipulate every single thing in that Finding of Fact as being entirely accurate in the report. May I respectfully state our feeling that the burden is still upon the County, and they must prove the case. We feel we have brought our witnesses and we are willing to go forward."

\* \* \*

"CHAIRMAN FAWSETT: You are not objecting to this being admitted in evidence and you don't object to the Board giving whatever consideration or weight that we believe that it deserves?

"MR. JOSEPH: Right.

"CHAIRMAN FAWSETT: The only additional evidence that we have will be witnesses that you see fit to call and which you have here tonight?

"MR. JOSEPH: Correct."

Mr. Joseph then stated:

"And I want to make clear that we still feel that the burden is upon the County to prove its case, and that it must do so with evidence. I think it also should be made clear that Officer Redding and his attorney had nothing to do with the preparation of these Findings of Fact nor were we consulted in regard to said preparation."

After making an opening statement to the Board of Appeals, Mr. Hertz offered the tapes of the proceedings before the Trial Board at its hearing on January 6, 1970,

which were received into evidence, without objection, as "County's Exhibit No. 1." Mr. Hertz then offered, without objection, the Findings of Fact and Conclusions of Law of the Trial Board, including a Report of Sergeant Edward J. Armstrong, as "County's Exhibit No. 2," and a Customer's Receipt for $24.95 from Zayre, which was part of the record before the Trial Board, marked "County's Exhibit No. 3."

Thereafter, Mr. Hertz asked to be excused from the hearing, indicating that he believed the Prince George's County Police Department had established a prima facie case and that he was waiving his right to cross-examine any witnesses offered by Redding. He was excused and thereafter Redding introduced his own and other testimony in his defense.

In the Findings of Fact and Conclusions of Law, the charges against Redding are recited with a list of those members of the Prince George's County Police Department who comprised the Trial Board—a Major, a Captain, a Lieutenant, a Sergeant and a Private. It was also recited that Mr. Hertz and Mr. Joseph were present, representing the Prince George's County Police Department and Redding, respectively. Redding was also present. The testimony of seven witnesses was thereafter summarized.

Charles R. Friedhoff, Assistant Manager for Suitomat, a leased department at Zayre's Department Store at Capital Heights, testified that he had been employed at that store for approximately one month. His initial contact with Redding was in the Men's Room of the store where Redding was changing his socks. Friedhoff stated that he knew nothing about the socks, as to whether they had been paid for. On December 20, 1969, Friedhoff, as he was leaving the store, was confronted by Redding who asked him about the jacket that had been placed underneath his counter in the Suitomat Department and asked Friedhoff if he would put the jacket in a bag and that Redding would pick it up later. Friedhoff stated that

he then went back to the Suitomat Department and told Danny Dyer (James Daniel Dyer, the next witness) to put the jacket in a bag for Officer Redding. Dyer replied that he was not supposed to do this, it being against company regulations and that he could not do it. Friedhoff told Dyer that it was all right, not to "sweat" it, that the officer knew what he was doing. Thereafter, Friedhoff left the store.

James Daniel Dyer, who had been employed by the Suitomat Department for approximately six weeks as a salesman, stated that it was against company regulations to give anyone any kind of gift. On December 20, 1969, he reported for work and, after straightening up his counter, placed a jacket that was under his counter back on the shelf in the Automotive Department as it had been lying under his counter for a week. Later, he was approached by Friedhoff, who inquired where the coat was. Dyer did not know that he was referring to the jacket he had placed back on the shelf. Friedhoff then went to the Automotive Department, got the jacket and placed it back under the counter. Before Friedhoff left the store, he called Dyer aside and told him to put the jacket in a bag when the officer came back for it and to put the security tape on it and to keep his mouth shut. Dyer stated that by placing the red security tape on the package, it was indicated that the package was paid for. Dyer then told Friedhoff that he should not do this and was told by Friedhoff to keep his mouth shut. Dyer did not comply with Friedhoff's orders because he knew it was wrong. After thinking about the matter and being uncertain about what to do, Dyer called the Manager of the Suitomat Department, Mr. Elman, and related to him what had happened. Mr. Elman said the situation would be taken care of. Dyer understood that Elman had called Mr. Schmidt, Manager of the Zayre Corporation, but did not know of any action taken by Schmidt at that time. Approximately ten minutes later, while Dyer was waiting on customers, Redding walked back to the Suitomat

Department and Dyer asked him when he was going to take the jacket. Redding replied, "When do you want me to get it?" and Dyer replied, "as soon as possible." Redding then took a bag, placed the jacket in it, put security tape on the bag and wrote his name on the security tape. He then placed the bag underneath the counter, walked past Dyer and a security guard, Mr. Mason, who was a short distance away. Dyer went over and checked the bag to make sure that he had made no mistake about what he had seen. Later, Redding came back to the Suitomat Department, took the jacket and walked out of the Suitomat Department. On December 31, Dyer talked to Redding at which time Redding stated that he was in trouble and that the jacket, as well as the socks, was a gift to him. Dyer knew nothing about the socks.

Sergeant Edward J. Armstrong, of the Inspectional Services Division of the Prince George's County Police Department, testified in accordance with his Report on the Redding matter. His full Report was attached, consisting of ten single spaced, letter size pages. From this Report, it appears that William Elman, Manager of the Suitomat Department, had telephoned Mr. Monihan, General Manager of the Zayre Store, who told him that Redding had placed a jacket in a bag from the Automotive Department, placed a red security tape on it and placed the package under the counter of the Suitomat Department. Monihan then called James Thomas, who was in charge of Security for the Zayre Corporation in the Washington District, and gave him this information, and later called him to tell him that Monihan had observed Redding leave the store with a package, go to an automobile and return without the package. Thomas then went to the store, spoke to Monihan who pointed out a row of automobiles, stating that Redding had placed the package in a white car. Thomas then went to the parking lot, looked into the white car (an Austin American) and saw on the front seat a Zayre bag with a red security tape on it, but no receipt. The coat of a Prince George's

County Policeman was hanging in the back of the white car. By inquiry, the white car was identified as owned by Redding. Thomas outlined the procedure for employees to make purchases. (Police officers assigned to this detail were considered employees.) All such purchases must be taken through cash register No. 12 where the employee pays for the item purchased and the item is then placed in a regular bag, secured by a red tape approximately one inch wide (a security tape) on which the employee's name is written. Security personnel are thus enabled to check employee purchases. Cash register No. 12 was then checked and no item from Department No. 53, the Automotive Department, for $8.97, the price of the jacket appeared. Then, all cash registers were checked, with the same result. Sergeant Armstrong thereafter interviewed Friedhoff and Dyer. Their statements to him were substantially the same as already set forth. Monihan confirmed the statement made by Thomas. Mr. Mason, the security officer, observed Redding take the bag but had no reason to be suspicious about it because it had the security tape on it. He notified Thomas that he had observed Redding take the bag out.

In regard to Redding's statement, the Report stated that Redding first related that he placed one bag containing several other bags under the counter of the Suitomat Department about 9:00 p.m. on December 20. Sergeant Armstrong then stated that the matter had been fully investigated and for Redding "to be honest with us." Redding then stated, "Okay, I can't lie too good, I'll be honest with you." He then made a complete admission to Lieutenant Turner and Sergeant Armstrong in regard to what he did. He placed the jacket under the Suitomat counter, placed it in a Zayre bag, put on the security tape, signed his name on the security tape and took the jacket from the premises; he did not pay for it nor did he have permission to take the jacket. He stated that he thought that Friedhoff was giving him the jacket as a gift. He was asked, "Did anyone say to you that the

coat was a gift and that you didn't have to pay for it?" to which he replied, "No, I just had the feeling it was a gift." He was asked further, if he thought it was a gift, why did he go to the trouble of putting the jacket in a Zayre bag and placing the security tape on it, to which Redding replied, "I did it right out in the open." Redding stated to Armstrong that upon learning of the investigation on December 22, he hid the jacket but would not state where it was, saying that he would either produce the jacket or make restitution in the amount of the value of the jacket. He volunteered that Friedhoff knew he was going to take the jacket and not pay for it. After the interview, Lieutenant Turner advised Redding that he was suspended for conduct unbecoming to a police officer. A formal notice of suspension was thereafter issued.

Redding then testified. He stated that he had purchased a coat from the Suitomat Department and that Friedhoff had given him a 20% discount on the coat. A customer's sales slip, No. 27802 in the amount of $24.95, dated "12/12" and signed by Friedhoff was introduced into evidence. He testified that Friedhoff had made him a gift of the jacket in question. The details in regard to placing the jacket under the counter, statements by Friedhoff and other matters were given but the account given by Sergeant Armstrong was in substance confirmed including his original statements and his later statement that it was no use to lie. Redding also stated that he first met Friedhoff when changing socks in the Men's Room. He took the socks because he was in a hurry and did not wish to stand in line to buy things. When he asked Friedhoff where he could pay for them, Friedhoff stated that he would take care of them.

George Bernard Norris, a private in the Prince George's County Police Department, testified that he had heard Friedhoff state to Redding on December 20 that "your jacket is ready." Later, Redding gave the jacket to Norris to return to the store after Redding had been suspended. Norris stated that Redding "is a good police of-

ficer and an asset to the Prince George's County Police Department." Two other privates in the Prince George's County Police Department, Officers Mumaw and Savoy, also testified that Redding was a good police officer and an asset to the force.

It was noted that the jacket was admitted in evidence as Police Department Exhibit No. 1.

The conclusion reached by the Trial Board was that Redding was not guilty under Section 15-14, C-20 of intentionally stealing the jacket but was guilty under Section 15-14, C-12 of conduct unbecoming an officer, "* * * by unauthorized conversion to your own use of merchandise which was the property of Zayre's Corporation * * *."

It was recommended that Redding be dismissed from the Police Department.

The two tapes—running for some eight hours—have been played to ascertain whether the Findings of Fact were supported by the evidence taken and presented a fair summary of that testimony. In our opinion, the Findings of Fact are supported by the testimony and represent a fair summary of the testimony.

At the hearing before the Board of Appeals, Redding testified on his own behalf. His testimony is largely cumulative. In regard to the jacket, Redding stated that he had no notice that the Suitomat Department and the Zayre Corporation were not the same. He saw the jacket, liked it and put it under the counter. He told Friedhoff that he wanted the coat, to watch it for him and not to let anyone else buy it. Later, Friedhoff was asked if the jacket was still back there. Friedhoff stated, "Poncho, do you want the jacket?" After Redding answered, "Yes," Friedhoff stated, "O.K. I will go get it ready for you and you go pick it up." When asked, "when did you first see the jacket," Redding replied, "I first saw the jacket about a week or ten days before the 20th before I purchased it, before I took it."

After he learned that an investigation in regard to the

jacket had begun, Redding took it over to his father's house and hid it "because I didn't know what to do." He hid it in a trash can but later got it back. He testified that he had no intention of stealing anything.

Dyer also testified at the hearing before the Board of Appeals. His testimony was largely a repetition of his testimony before the Trial Board with some additional references to Friedhoff as "a very nasty person" with the reputation of "a very good liar," especially in giving the impression that he owned or was manager of the concession. One of the members of the Board of Appeals asked him: "Did you feel at the time that Officer Redding was stealing this jacket * * *" to which Dyer answered, "The dirty look I gave him would have maybe told him." Officer Norris testified that he had received a gift of gloves from Zayre and that it was usual to give the policemen the same discount as that given other employees. He stated, "If you really want to get into brass technicalities, no police officer is supposed to accept anything."

Officer Mumaw testified that stores offer discounts to police officers and that at Christmas time he had accepted bottles of liquor from different merchants and a turkey from one man at Thanksgiving time. He thought that Redding's punishment was too harsh.

Counsel for Redding had noted his contention at the end of the Police Department's case that the Police Department carried the burden of proof and moved that the charges against Redding should be dismissed for the failure of the Police Department to make out a prima facie case. The Board of Appeals declined to so rule and, after Redding had put on his evidence, decided by a two to one vote, by a decision dated March 13, 1970, and received by counsel for Redding on March 23, to sustain the findings of the Chief of Police dismissing Redding.

On March 30, 1970, Redding filed a Request for a Rehearing before the Board of Appeals and served a copy on counsel for the Police Department. In the Points and

Authorities Supporting this Request, Redding stated that he had new evidence to present, *i.e.,* (1) the testimony of James Nelson of the Prince George's County Police Department in regard to the identification of Redding's automobile by a police officer as set forth in Sergeant Armstrong's Report; (2) the testimony of William Elman in regard to Friedhoff; and (3) the testimony of Redding, himself, relating to the use of the jacket in question after taking it from the Zayre store. It was also stated that counsel for Redding wished to emphasize that the hearing before the Board of Appeals is *de novo* and the issues were to be decided on the basis of the evidence presented and not on the basis of whether the Trial Board had acted within the scope of its discretionary right, which point had not been raised previously at the hearing of the case.

On April 13, 1970, the Board of Appeals vacated its previous order and in a resolution stated that a final order would be issued upon a rehearing and reconsideration of the appeal. The clerk of the Board of Appeals gave notice on May 8 that a hearing would be held on May 18 at 7:30 p.m. "for the purpose of argument on matters not previously heard before the Board which you [Mr. Joseph, Counsel for Redding] stated were material and relevant to this case."

On the evening of the hearing on May 18, counsel for the Police Department objected to proceeding with the rehearing because (1) there being no statutory authorization for a rehearing, the proposed rehearing could only be had upon an allegation and a showing by the person applying for the rehearing that there was fraud, surprise, mistake or inadvertence, none of which was alleged or shown and (2) the Board of Appeals decided to grant the rehearing without hearing from the Police Department thereby denying it due process of law. After argument by counsel for the parties, the Board of Appeals— consisting of Vice Chairman Pristoop and Member Miller (Chairman Fawsett having died prior to May 18)—

took the matter under advisement with the Board's counsel, Mr. Flynn, and thereafter returned announcing through Mr. Flynn that it would consider Redding's motion as one to take additional testimony due to inadvertence and would deny the motion of the Police Department but would treat it as a motion to strike the testimony at the end of Redding's case.

The testimony of Officer Nelson was merely cumulative to that produced before the Trial Board. He stated that he was the officer who identified Redding's white automobile and that Redding had told him that Friedhoff had given him the jacket. Elman's testimony was also cumulative. He thought there had been a misunderstanding by Redding that he had been given the jacket; but he could not explain why Zayre filed a complaint against Redding, stating that all he did "was report that something was taken from the store without * * * being paid for." The Board of Appeals declined to hear the testimony of George B. Norris on the ground that he had testified at the last hearing and that the price of the gloves he had received as a gift was not relevant.

The Police Department then produced Chief Free who testified in regard to the reasons why he sustained the findings of the Trial Board. He stated:

> "* * * I think I have to—I believe my job, or my function, is to put on the road for the people of Prince George's County the finest police department that you can possibly get. I think probably the main thing that an officer must have, the main attribute certainly must be honesty. This is the one thing that he must have is honesty. I felt that Private Redding was dishonest in this instance, and for that reason I felt that he should not be a member of this department.
>
> "Q. Chief Free, what did you base your conclusion on that he had been dishonest? A. Well, when he actually took the jacket. Now, certainly if someone is going to give you something you

don't have to hide it under a counter and then put a certain—put it in a certain bag with a red sticker on it which designates employee, sign your name on it. This was done as a subterfuge. It has to be that way.

"And then, of course, taking it out and putting it in his car. And then when he was approached after the complaint had been registered by Mr. Monahan, the general manager of the Zayre's Corporation, he was not frank, certainly, with the investigating officers. He told them at first that he had taken a bag containing other bags and placed it under the counter of the Suitomat department of this Zayre department store. He knew nothing of the taking of a jacket. This was his first story.

"Then he said, 'O.K., I can't lie too good. I will be honest with you.' He admitted he had taken the jacket. He placed it in a Zayre bag, sealed it with a red security tape, signed his name on the security tape, and left the premises without paying for the jacket.

"Now, his excuse was that he thought the jacket was a gift, although no one, including Mr. Friedhoff, had ever told him it was a gift.

"So far as I am concerned, I honestly believe that this was taken by Private Redding without the knowledge of the people that should have known about it."

On June 22, 1970, the Board of Appeals filed a resolution overruling the motion to strike and determined that there was a sufficient showing by Redding of inadvertency to warrant a rehearing accepting, without admitting, the Police Department's contention that fraud, surprise, mistake or inadvertency must be shown. Also, on June 22, the Board of Appeals passed an order which, after making certain findings of fact, concluded that (1) Redding exercised indiscretion in his acceptance of the

article of clothing, (2) the finding of the Trial Board that Redding was guilty of conduct unbecoming an officer should be affirmed and (3) dismissal was "inappropriately severe for an officer with a previously unblemished record." It ordered that Redding be reinstated on the police force, subject to a $200 fine and a three month suspension commencing on the date of his dismissal by Chief Free and that his pay be retroactive to the date the suspension period terminated.

On June 26 Chief Free filed a Petition for "Injunction, Mandamus and Such Further Relief as to the Court May Seem Proper" reciting the basic facts and alleging that the Board of Appeals acted arbitrarily and capriciously in reversing its prior decision when there was no error, fraud, mistake or inadvertency shown, but rather a mere change of mind without legal justification. It alleged also that Chief Free had advised Redding on June 26 that he need not report for duty in view of the challenge to the Board's action but that he would be paid his salary in the event the circuit court affirmed the Board's action. The requested relief was that the circuit court issue "a Writ of Mandamus and/or Injunction nullifying the Board of Appeals Order of June 22, 1970" and for a Show Cause Order directing the Board of Appeals to show cause why the order of June 22 should not be nullified and made void. Ultimately, the Board of County Commissioners for Prince George's County was substituted for Chief Free and the case was submitted to Judge McCullough for disposition. Judge McCullough, on January 4, 1971, filed an opinion indicating that the mandamus was a proper form to seek relief under the circumstances of the case and that the Board of Appeals had no authority to grant Redding a rehearing and to reverse its first order. Also on January 4, 1971, the circuit court ordered that the order of the Board of Appeals of June 22, 1970," "which reinstated Defendant Redding on the Police Force be and is hereby declared null and void." An appeal to the Court of Appeals from this order was timely filed by Redding.

Redding raised two questions before us:

1. The appellee failed to sustain its burden of proof at the initial hearing before the Board of Appeals.

2. The lower court erred in ruling that the Order of the Board of Appeals reinstating the Appellant Redding on the Police Force was null and void.

We now turn to a consideration of these questions.

(1)

In our opinion, sufficient evidence was produced by the appellee before the Board of Appeals both to establish a prima facie case and to support the decision of the Board of Appeals of March 13, 1970, sustaining Redding's dismissal from the force.

As we have already observed, there was ample evidence in the Findings of Facts and Conclusions of Law filed by the Trial Board and in supporting evidence in the tapes to support the decision of March 13, 1970, of the Board of Appeals. There were no objections by counsel for Redding to the admission of the tapes, the Findings of Fact and Conclusions of Law and the receipt for the purchase of a coat by Redding into evidence before the Board of Appeals. They were, therefore, properly before the Board of Appeals; and, as we have noted, they made out a prima facie case for the Police Department and the County Commissioners. The tapes indicate that counsel for Redding was afforded the right of cross-examination and freely and forcefully availed himself of that right. The Board of Appeals was not bound to accept all or any part of the testimony contained in the tapes or in the Findings of Fact and Conclusions of Law. It did, however, find this evidence to be probative and the evidence supports the decision of the Board of Appeals. Redding complains that some of the evidence admitted was hearsay; but we have held that such evidence is admissible before an administrative body in contested cases and, indeed, if credible and of sufficient probative force, may be the sole basis for the decision of the admin-

istrative body. See *Tauber v. County Board of Appeals*, 257 Md. 202, 213, 262 A. 2d 513, 518 (1970) and prior cases therein cited. In addition, there were no objections to the hearsay evidence taken before the trial board.

### (2)

We are also of the opinion that the lower court properly ruled that the Board of Appeals had no legal basis for reconsidering or reopening the decision of March 13, 1970, and hence the Board's decision of June 22, 1970, was null and void.

There is no statute or ordinance which gives the Board of Appeals the power of reconsideration or of rehearing. The common law rule in regard to the power of an administrative body acting in a quasi-judicial capacity is therefore applicable. Our predecessors in *Zoning Appeals Board v. McKinney*, 174 Md. 551, 564-566, 199 A. 540, 546-547 (1938) indicated that in that type of situation, the administrative body has the right to reconsider a decision if an error has been caused by fraud, surprise, mistake or inadvertence. We cited *McKinney* with approval in *Kay Construction Co. v. County Council for Montgomery County*, 227 Md. 479, 177 A. 2d 694 (1962) ; in *Schultze v. Montgomery County Planning Board*, 230 Md. 76, 185 A. 2d 502 (1962) ; and in *Gaywood Community Ass'n v. Metropolitan Transit Authority*, 246 Md. 93, 227 A. 2d 735 (1967). In *Kay, Schultze* and *Gaywood*, we pointed out that a mere change of mind, without any intervening change in conditions or other different factors, did not amount to "fraud, mistake, surprise or inadvertence," justifying a rehearing or reconsideration. In the present case, there was no newly discovered evidence and the evidence produced was cumulative as we have observed. Indeed, there was no allegation in the Petition for the Rehearing that the prior decision had resulted from "fraud, mistake, surprise or inadvertence" and the burden of so alleging and proving is upon the person seeking the rehearing or reconsideration. The Board of Appeals sought to indicate that the prior decision was

112

made as a result of "inadvertency," but it clearly was not. There was simply no existing element of the rule and no reconsideration or rehearing could be lawfully held by the Board of Appeals as the lower court properly ruled.

The *form* of the "Petition for Injunction, Mandamus and Such Further Relief as to the Court May Seem Proper," Law No. 45,019 gives us some difficulty. The petition is far from a model of careful pleading. Rather, it presents a "shotgun" approach with the hope of the pleader that one shot will hit his opponent and bring him down. We interpret the petition as an action at law for declaratory relief (authorized by the Uniform Declaratory Judgment Act, Code (1971), Art. 31 A, §§ 1 et seq.) *i.e.*, to declare the order of June 22, 1970, of the Board of Appeals null and void with ancillary relief by way of injunction or mandamus, if required, pursuant to Maryland Rules BF 40, 41, 42 and 43. It can hardly be an action for a writ of mandamus, as such, pursuant to Rules BE 40-46 in that (1) the petition was not verified as required by Rule BE 40 c and (2) there is no prayer for relief setting forth the peremptory form of the writ of mandamus sought. See Rule BE 45. Indeed, the prayer for relief *is for declaratory relief* and the relief obtained from the lower court was a declaration that the order of June 22, 1970, was null and void. In its opinion, the lower court suggests that a writ of mandamus *might issue* to compel the Board of Appeals to grant the motion to strike the evidence introduced at the second hearing on behalf of Redding or that the Board be enjoined from attempting to enforce its order of June 22, but the fact is that neither a writ of mandamus nor a writ of injunction did issue. Instead, declaratory relief was awarded—properly in our opinion—there being no necessity under the circumstances for issuing writs of mandamus or of injunction.

*Order of January 4, 1971, affirmed, the appellant to pay the costs.*