# DICKINSON-TIDEWATER, INC., ET AL. *v.* SUPERVISOR OF ASSESSMENTS OF ANNE ARUNDEL COUNTY

[No. 67, September Term, 1974.]

*Decided December 3, 1974.*

The cause was argued before Murphy, C. J., and Singley, Smith, Digges, Levine, Eldridge and O'Donnell, JJ.

*John J. Ghingher, Jr.*, with whom were *Max Stul Oppenheimer* and *Weinberg & Green* on the brief, for appellants.

*William J. Giacofci, Assistant Attorney General*, with whom was *Francis B. Burch, Attorney General*, on the brief, for appellee.

Levine, J., delivered the opinion of the Court.

This appeal is from an order of the Maryland Tax Court upholding six real property assessments. Involved are four adjacent parcels of land situated in Anne Arundel County on State Route 46, opposite Baltimore-Washington International Airport.[1] Each is improved by one or more office buildings. The assessments were applicable to the tax-levy year of 1972-73, for which the date of finality was January 1, 1972. After receiving their final notices of assessment, appellants lodged timely protests with the Appeal Tax Court of Anne Arundel County. Afforded no relief by that body, they then took their cases to the Maryland Tax Court (the Tax Court), where, save for some minor arithmetical adjustments, they were also unsuccessful. Unfortunately for the taxpayers, they shall fare no better in this Court.

The four parcels are owned by three entities. Parcels A

---

1. Formerly named Friendship International Airport.

and B, totaling 22.7325 acres, are owned by Baltimore-Washington Science & Industry Center, and were acquired in 1967 at a total cost, including "site improvements," of $505,258.[2] Parcel A is improved by a one-story office building (NSA 1), completed in September 1967 at a cost of $1,373,048, which is under lease to the National Security Agency (NSA) until March 31, 1978, at an annual rental of $305,000. This lease is subject to five one-year renewal options with corresponding incremental increases. Parcel B is improved by a two-story office building (NSA 2), completed in July 1968 at a cost of $3,343,048, which is also under a lease to NSA expiring on May 31, 1979, at an annual rental of $863,119. Here, the tenant has two five-year options at increased rentals for each additional term. The total assessment for parcel A, as refined by the Tax Court, is $916,135, consisting of $160,910 for the land and $755,225 for the improvements; and the assessment for parcel B is $2,460,390, consisting of $316,475 for the land and $2,143,915 for the improvement.

Parcel C, consisting of 12.5757 acres, is owned by Friendship Investment Company, and was acquired in 1968 for $358,054, which included the cost of site improvements. It is improved by a seven-story office building (NSA 3), gatehouse and parking lot, completed in 1970 at a total cost of $6,778,095, all of which is under lease to NSA until January 1985 at an annual rental of $1,523,040; it is not subject to any renewal options. The adjusted assessment for this parcel is trifurcated, since the land is divided into three "subparcels." The assessment for the office-building site is $4,177,250, of which $144,625 is for the land and $4,032,625 is for the improvement. The assessment for the gatehouse site is $54,860, of which $5,800 is for the land and $49,060 is for the improvement. The assessment for the parking-lot portion is $179,000, of which $113,660 is for the land and $65,340 is for the improvement.

Parcel D, 1.607 acres in size, is owned by

---

2. "Site improvements" include such matters as the clearing, grading and filling of land.

Dickinson-Tidewater, Inc., and was acquired in 1967 at a total cost — including site improvements — of $35,403. It is improved by a two-story, multi-tenant commercial office building completed in December 1967 at a cost of $300,899. The building is leased to various tenants at rentals ranging from $4.20 to $6 per square foot. The total assessment for this parcel is $261,595, consisting of $33,475 for the land and $228,120 for the improvement.

The Assessor's single witness — having qualified as an expert — testified that he arrived at the assessment on the improvements principally by capitalizing the rental income. In addition, he stated that he also considered a countywide survey made in 1971 which took into account:

> ". . . Number one, current replacement costs for all buildings and similar structures as evidenced by costs for Anne Arundel County developed through the help of the Assessments Department and through the help of the contractors that we talked to in the course of appraising some 100 industrial and commercial properties in the County for the County Assessments Office. In each case, the value that we arrived at was arrived at on the basis of several considerations the first being the then-current replacement cost, which would be average-1971; sales of any properties that were similar in use, size and construction that may have existed, as well as an analysis of the income so that we could arrive at an indicated capitalized value for all the subject properties where that approach was pertinent. . . ."

He conceded that no allowance was made for the fact—a point emphasized by appellants — that the buildings leased to NSA were being used for a "special purpose" and, not being subject to long-term leases, might require substantial renovations upon being vacated at the expiration of the original lease periods. The Assessor adopted the position that consideration of the "special-purpose" nature of the buildings leased to NSA, or so-called "functional

obsolescence," should be deferred until such time as the existing leases have actually terminated without the options having been exercised, and the vacant property has then been exposed to the rental market; or, at the very least, until NSA signifies its intention not to renew at the expiration of the current lease periods.

The assessments on the land were established by the "comparable sales" method, supplemented by the capitalization of income approach. Initially, the Assessor had determined that the value of the land was $40,000 an acre, but at the Appeal Tax Court hearing, he agreed to an adjustment that resulted in a uniform appraisal of $35,000 per acre for all of the land included in these cases. Assessments in Maryland, of course, were based on 60% of the fair market value for this particular year.

In respect to the assessments on the improvements leased to NSA, the testimony presented by appellants stressed the specialized nature of that federal agency, and the substantial costs to be anticipated in renovating the buildings for conventional leasing purposes should they be vacated at the expiration of the current lease periods. Thus, the principal spokesman for appellants testified:

> ". . . Well, it is the National Security Agency. They are a top secret organization of the United States Government; and, as such, they require quite a bit of security equipment. To convert these buildings to a multi-tenant or even a single commercial tenant would require the removal of most of this security equipment. And also it would require the partitioning of these various floors because the design of the building is such that it calls for huge open areas."

This witness denied that the "special purpose" factor had been considered in determining the amount of rent currently being paid by NSA. As they do here, appellants conceded below that apart from the disallowance of the so-called functional obsolescence, the assessments on the improvements would have been reasonable and proper.

The fair market values for the land in the opinion of appellants' expert were as follows: The parcels owned by Baltimore-Washington Science & Industry Center — $15,000 an acre; the land owned by Friendship Investment Company — $20,000 an acre; and the parcel owned by Dickinson-Tidewater, Inc. — $30,000 an acre. He supported his opinion by an analysis of 32 comparable sales which ranged in price paid per acre from $5,000 to $37,500; and, in the terms of distance removed from the subject properties, extended from "across the street" to some 17 miles. He acknowledged, however, that, in drawing upon the 32 comparable sales for his opinion, he made no adjustments for differences in the time of sale or the cost of site improvements.

In sustaining the assessments, the Tax Court rejected appellants' complaint regarding "functional obsolescence," noting the expiration dates of the various NSA leases, the renewal options applicable to two of the three buildings and the increased rentals to be paid if those options are exercised. With regard to parcels A and B, the court said:

> "The argument as to the special character of these buildings should not be of any particular concern to the Assessor until the leases have terminated and some tangible evidence of the limited value of these properties is shown."

In respect to parcel C, it said:

> "However, this Court is of the opinion that the special purpose buildings located on this land are not limited in value as long as the lease is operative and the question of limited value will not become a factor until the lease period has expired in 1985."

Regarding the land assessments, the court was of the view that the favorable rental income in relation to the assessments amply justified the latter in each case. Thus, it noted that the annual rent for A, B and C exceeded 34% of the combined land and improvement assessments for those parcels; and that in the case of parcel D, the rental value amounted to 31% of the combined assessments.

In this Court, appellants raise the following contentions:

(1) That the Tax Court failed to comply with its own Rule 7 which requires each party in a proceeding before it to furnish the opposite party with an itemized list of properties upon which it intends to rely to prove comparable sales. Related to this is their argument that the opinion testimony of the Assessor's expert witness should have been excluded, since he "provided no factual basis for his conclusion as to value."

(2) That the decision of the Tax Court — regarding the land assessments — is against the weight of the evidence, and therefore should be reversed.

(3) That the determination of value on the improvements was arbitrary and capricious in that the Tax Court failed to take into account that the buildings were of a "special-purpose" nature.

## (1)

In contending that the Tax Court did not comply with Rule 7, and that the opinion evidence regarding land values should have been excluded, appellants seize upon this colloquy which ensued during the testimony of the Assessor's expert witness:

"Q What approach did you use and how did you use it?

"A We established the value of the land involved in each of these appeals on the basis of our analysis of the sales of similar or comparable land throughout the whole County of Anne Arundel. I also obviously relied on my knowledge of the surrounding area close by in Baltimore County since I had worked there for many years.

"MR. GHINGHER: I object to the testimony and move it be stricken. We have not received any comparable land sales as required by this Court's rule — not even after I called my brother on Friday and advised him that I hadn't received any land sales and asked him to send them to my appraiser

on Monday or Tuesday. I haven't yet seen any, and I rest on the rule and submit that this witness cannot testify in general on that subject.

"CHIEF JUDGE KORN: All right, sir. Mr. Giacofci?

"MR. GIACOFCI: Your Honors, I respectfully submit that Mr. Vermilyr is basing his opinion on a general awareness of values. He is not relying on any specific sales — other than we do have one sale furnished also by counsel for the Petitioner. I will get into that and I will show that that specific sale is the one he is really relying on.

\* \* \*

". . .The Court is of the opinion that your objection will be overruled, Mr. Ghingher. The testimony right now has been generally speaking rather than specific. Your objection is noted for the record. Of course, the weight of this evidence will be determined by the Court. Let us continue.

"Q (Mr. Giacofci:) Mr. Vermilyr, just to clarify one point, at this point we are talking about your general awareness of sales of industrial properties within Anne Arundel County, is that correct?

"A Yes, sir.

"Q Now, prior to the date of finality, based on your experience and on your general awareness, what was the range of values for those kinds of properties in Anne Arundel County?

"MR. GHINGHER: Same objection.

"CHIEF JUDGE KORN: Answer the question.

"Q Again, based on general awareness.

"A From a low of approximately $12,000.00 to a high of $40,000.00 an acre for the period 1971."

In effect, therefore, appellants complain that the Assessor's witness relied on an undisclosed number of comparable sales for his opinion of land values, but failed to deliver an

advance list in accordance with the rule; hence, the facts upon which he based his opinion of land values were not revealed. Furthermore, they say, his testimony in this regard was conclusory, and should have been excluded. We do not see it quite that way.

The short answer to this contention is that any properties actually relied upon by the Assessor's expert witness for his opinions of value — primarily the sale labeled "Sale No. 2," presented by appellants' own expert — are thoroughly reflected in the record. Moreover, they were not only known to appellants, but had been included in the 32 comparable sales relied upon by their expert in the testimony which he had presented earlier. Thus, there was neither an impermissible departure from the procedural rule nor the absence of a factual basis for the witness's expert opinion.

Unquestionably, the facts upon which the opinion of an expert witness is predicated must be stated, *Fink v. Steele,* 166 Md. 354, 363, 171 A. 49 (1934); this is so because the opinion of an expert must rest upon facts legally sufficient to form a basis for his conclusion, *Stickell v. City of Baltimore,* 252 Md. 464, 474, 250 A. 2d 541 (1969). If the facts relied upon for the expert opinion are not revealed, it becomes impossible to ascertain whether the conclusion drawn from them possesses sufficient probative force; or is not mere conjecture or speculation, *State, Use of Stickley v. Critzer,* 230 Md. 286, 290, 186 A. 2d 586 (1962); *Fink v. Steele, supra.* As we have indicated, the facts upon which the Assessor's expert witness relied are reflected by the record.

Nor, as we have already suggested, is there any substance to the contention that appellants were the victims of surprise at the hands of the Assessor's witness. Although administrative agencies are not bound by the technical common law rules of evidence,[3] they must observe the basic rules of fairness as to parties appearing before them, *Rogers v. Radio Shack,* 271 Md. 126, 129, 314 A. 2d 113 (1974); *Fairchild Hiller v. Supervisor,* 267 Md. 519, 524, 298 A. 2d

---

3. Maryland Code (1957, 1969 Repl. Vol.) Art. 81, § 229 (f) expressly adopts this proposition for proceedings before the Maryland Tax Court.

148 (1973); *Dal Maso v. Bd. of Co. Comm'rs*, 238 Md. 333, 337, 209 A. 2d 62 (1965). Where, as here, however, the facts upon which a witness relies for his expert opinion come as no surprise to the complaining parties, and, indeed, are actually presented by the latter in the first instance, absent any other basis for so contending, no violation of the basic rules of fairness is manifested. The extensive cross-examination which appellants were afforded and exercised merely reinforces this conclusion. *Compare Rogers v. Radio Shack*, *supra*, at 129, *with Redding v. Bd. of County Comm'rs*, 263 Md. 94, 110, 282 A. 2d 136 (1971), *cert. denied*, 406 U. S. 923, 92 S. Ct. 1791, 32 L.Ed.2d 124 (1972).

Thus, no error in admitting the opinion testimony of the Assessor's expert witness has been demonstrated.

(2)

In attacking the Tax Court affirmance of the six land assessments, as being against the weight of the evidence, appellants stress three specific points. First, they insist that in arriving at a uniform value of $35,000 per acre for the land in its entirety, the Assessor, in reality, did so by taking an "average" of the values for the four parcels. They say that the effect of this approach was to ignore such important factors as ". . . size, access, location, frontage, purchase price [and] date of purchase . . . ." They then argue that ". . . each of these three separate taxpayers is entitled to have its land assessed separately . . . ." Thus, the assessment was not ". . . predicated on the value of the land which [each] owns, but rather on the 'average' value of the acreage of all [four] parcels . . . ." The result is "an average tax, rather than a tax on the acreage which each owns."

Secondly, appellants maintain that in focusing upon their comparable "Sale No. 2" for his opinion of the land values, the Assessor failed to consider that its relatively high sales price stems from the fact that it was the final unit of an assemblage. They point out that where this is the case, the practical effect is to inflate the market value of the final link in the aggregate. Appellants note in this connection that

this parcel was a mere 1.126 acres in size, which also would tend to increase its per acre price.

The third prong of appellants' challenge to the land assessments is the argument that the Tax Court decision appears to rest solely on the capitalization of rental income. While conceding that this might properly support an assessment on the improvements, they argue that, notwithstanding its improved state, the land must be treated for assessment purposes as though it were still in a "raw" condition. They point out in this regard that the Assessor is required to value and assess land and the improvements thereon separately, Code (1957, 1969 Repl. Vol.) Art. 81, § 19 (a).

For the most part, the answer to these contentions is found in the rules applicable to judicial review of administrative-agency decisions. Prior to the enactment of Ch. 385 of the Laws of 1971, appeals from the Maryland Tax Court were taken to the circuit court in one of the counties or to the Baltimore City Court. In the course of amending Code (1957, 1969 Repl. Vol.) Art. 81, § 229 (l), so as to provide for direct appeal to this Court, the General Assembly also deleted the part which specified that unless the order of the Tax Court appealed from "is erroneous as a matter of law or unsupported by substantial evidence appearing in the record, it shall be affirmed." As a consequence, appeals from the Maryland Tax Court no longer are governed by a statutory scope of judicial review.[4] Nevertheless, it is clear in Maryland that even "[w]here [a] statute or ordinance makes no provision for judicial review, an implied limitation upon an administrative board's authority is that its decisions be supported by facts and that they be not arbitrary, capricious or unreasonable." *Heaps v.*

---

4. In contending that the determination of the Tax Court is against the weight of the evidence, appellants have proceeded upon the erroneous premise that the scope of review delineated in Code (1957, 1971 Repl. Vol.) Art. 41, § 255 (g), applicable to judicial review of administrative-agency decisions, now governs appeals from the Maryland Tax Court. Sections 244 (a) and 318 of Art. 41, when read together with § 247A of Art. 81, establish beyond question that the Administrative Procedure Act does not apply to the Maryland Tax Court.

*Cobb,* 185 Md. 372, 380, 45 A. 2d 73 (1945). The Court said in *Heaps*:

> ". . . [Administrative] decisions carry with them the presumption of validity and, where the statute or ordinance provides for an appeal to the courts, will not be disturbed on review if the record shows *substantial evidence* to sustain the findings. . . ." *Id.* at 378-79 (emphasis added).

Thus, where the scope of review is not specified in the statute, the substantial evidence test has been followed. *Snowden v. Mayor & C.C. of Balto.,* 224 Md. 443, 445, 168 A. 2d 390 (1961); *Maryland Racing Comm. v. McGee,* 212 Md. 69, 80, 128 A. 2d 419 (1957); *Heath v. M. & C. C. of Baltimore,* 187 Md. 296, 304, 49 A. 2d 799 (1946). *See also Insurance Comm'r v. Nat'l Bureau,* 248 Md. 292, 300-01, 236 A. 2d 282 (1967).

The substantial evidence test, as applied in cases lacking a statutory standard or scope of review, is similar to the tests laid down by the various statutes, and essentially is limited "to whether a reasoning mind reasonably could have reached the factual conclusion the agency reached. This need not and must not be either judicial fact-finding or a substitution of judicial judgment for agency judgment." *Insurance Comm'r v. Nat'l Bureau, supra,* at 309-10; *see Fairchild Hiller v. Supervisor, supra,* at 521.

Examined in light of these principles, the conclusions and resulting decision of the Tax Court are supported by substantial evidence. As we noted earlier, although the Assessor's witness clearly considered land values generally throughout the county, he focused on appellants' comparable "Sale No. 2" to support his opinion of the land evaluations in question here. Accordingly, he pointed out the qualities attributable to appellants' land which distinguished it from many parcels throughout the county. First, he attached considerable weight to the proximity of appellants' property to a major international airport. Secondly, he stated that the elevation of the subject property some 15 to 25 feet above the highway — the "airport road" — is an appreciating factor.

In relating appellants' property to their "Comparable Sale No. 2," the witness stated that the latter was 1.126 acres in size and was sold for $22,200 an acre on April 26, 1969. He also noted that although it enjoyed the same favorable location factor as appellants' land, when sold it had "not [been] readily visible from Airport Road." Hence, "there had to be a substantial amount of site improvements made to this property before it was in the same condition that the subject properties are." Additionally, in comparing "Sale No. 2" with appellants' land, and thereupon arriving at a uniform valuation of $35,000 an acre, he considered not only the costly "site improvements" required by the former, but the fact that the sale had occurred almost three years before the date of finality in this case. In this interval, land values had experienced a rapid appreciation, a fact of which we could virtually take judicial notice. In short, the witness made wholly permissible adjustments, in comparing "Sale No. 2" with the subject properties, for intervening inflation and site-improvement costs.

The argument advanced by appellants that the Assessor arrived at the $35,000 per acre evaluation by striking an average, and that he also failed to allow for the smaller size of "Sale No. 2," simply does not withstand scrutiny. What the Assessor's witness said was:

"Q In making your appraisal of the fair market value of all the subject tracts, did you use a *uniform* rate?

"A To all the subject tracts that are improved, yes, sir.

\* \* \*

"Q You heard Mr. Floyd testify that in his opinion the larger the tract the less value per acre should be ascribed thereto. In your professional opinion and based on your experience, do you agree with that theory; and if so, why?

"A If you were dealing with vacant land, I think I would have to agree with Mr. Floyd's approach

> and his statements almost exactly. But *once the land has been improved* and the site improvements have been made and *it is then occupied for a uniform use,* then it is my *opinion that the average price per acre for the improved portions of all this land should be treated alike.* They are occupied for the same use and they are improved in the same manner, and the amount of the income attributable to land is therefore presumably uniform. And therefore I believe and *I think the sales of properties which have been improved will show that the price per acre then becomes fairly uniform*" (emphasis added).

This testimony, the sole evidence on which appellants can possibly rely for their contention that the Assessor predicated the assessments on the "average" value of the acreage of all four parcels, simply does not support that claim. What the witness clearly indicated was that he attributed a *uniform* per acre valuation to the entirety because of its improved state. The single word "average," removed from the context of the witness's complete testimony, is much too slender a reed to sustain appellants' argument.

The witness also buttressed his opinion of value by allocating a portion of the rental income to the land, thoroughly explaining how he did so. Capitalization of gross income has long been recognized as a relevant factor to be considered by the taxing authorities, *Bornstein v. State Tax Comm.,* 227 Md. 331, 337, 176 A. 2d 859, 96 A.L.R.2d 661 (1962); *see Weil v. Supervisor of Assess.,* 266 Md. 238, 247, 292 A. 2d 68 (1972); *cf. Meade Heights v. Tax Comm. of Md.,* 202 Md. 20, 32, 95 A. 2d 280 (1953).

We are not unmindful of the testimony presented by appellants' expert witness that his reason for making no "time adjustments" in relating the comparable sales to the subject property was, as he stated, that ". . . from a market standpoint this is not proper . . . . Maybe from an assessment standpoint it is, but from a market standpoint

it is not a proper approach. . . ." He also acknowledged that he had made no adjustments, where applicable, for required site improvements. Nor, as previously intimated, have we overlooked this witness's emphasis on the size of the subject parcels as compared with some of the smaller comparable sales, specifically including "Sale No. 2," and his testimony "that the larger the acreage the lower the unit cost or per acre cost."

These conflicting opinions between the competing expert witnesses — doubtlessly reflecting earnest conviction on the part of each — merely demonstrate once again the validity of what Judge Smith has succinctly observed for the Court on two occasions: "Valuation of land is not an exact science. Experts nearly always differ as to their opinion of fair market value." *Fairchild Hiller v. Supervisor, supra,* 267 Md. at 521; *Weil v. Supervisor of Assess., supra,* at 254.

Nor does this mean that appellants' attack upon the Assessor's expert for applying capitalization of income to land has gone unheeded. First, as we have clearly indicated, the witness relied primarily on the "comparable sales" approach, and utilized income capitalization merely to confirm his results. Secondly, the relative weight to be accorded to any relevant factor in a particular case is for the assessing authorities and not for the courts. *Supervisor of Assess. v. Banks,* 252 Md. 600, 609, 250 A. 2d 860 (1969); *Bornstein v. State Tax Comm., supra,* at 337. Thus, while appellants question whether the capitalization of income method may be applied to land assessments, we have found no expert testimony in the record to support their argument. But even if we had, this is manifestly not a difference of opinion to be reconciled by us. Nor are we troubled by the emphasis placed upon the capitalization method by the Tax Court. We are unable to infer from this its rejection of the extensive testimony addressed to the "comparable sales" approach.

The concession by the Assessor's witness that, in relying upon "Sale No. 2," he did not consider it as part of an assemblage also draws fire from appellants. The implication

is that it was; and that the sales price was exaggerated for that reason. To support this, they point out that the purchaser in that sale was a group identified as "Dickinson Associates," and the similarity between this name and one of the appellants should have been sufficient to inform the Assessor's witness that "Sale No. 2" was part of an assemblage. Whether a knowledgeable expert should have been alerted by the similarity of names or not, we cannot say. We note that the record is singularly lacking in any evidence to establish that "Sale No. 2" was part of an assemblage. The appropriate arena for the disclosure of this fact, if it was a fact, would have been the Maryland Tax Court.

(3)

Lastly, we find no merit in appellants' contention that the Assessor erred in refusing to "take into account that the [NSA] buildings involved were 'special-purpose' buildings." The thrust of this contention is that a prospective purchaser of those buildings would consider the likelihood that substantial renovation costs would be required in the event NSA failed to exercise its options to renew at the expiration of the current lease terms, and would therefore pay less for the property at this time. Hence, an allowance reflecting the costs of those renovations should have been made in arriving at the full cash value of the improvements.

What appears to be completely overlooked by this argument is that the Assessor did not rely on the "comparable sales" approach in establishing the assessment on the improvements. Rather, as we noted earlier, he employed the capitalization of income method in arriving at his valuation of the improvements, an approach with which appellants' expert was in full accord. In any event, as the Tax Court was free to conclude, what might affect the price to be paid by an informed purchaser diminishes in importance where the valuation is based exclusively on capitalization of income.

In essence, the Tax Court held that the claim of "functional obsolescence" is premature; and that any such

allowance should await the expiration of the original lease terms or an earlier announcement by NSA that it does not intend to exercise the renewal options. This determination recognizes the speculative nature of appellants' argument, and ample support for it may be found in the testimony of the Assessor's witness:

> "THE WITNESS: After considering the possibility of functional obsolescence being involved in structures of this type, we decided — or I decided that because of the nature of the lease, the fact that the buildings were built for the purpose for which they are now being specifically used, they are still being occupied by the tenants for whom they were built, and that the leases were from, at that point, 7 to 10 years with a few renewal options still to run — we decided that functional obsolescence as of that date had no bearing on the value of these properties."

As one of the Tax Court judges aptly observed, "... this is the Federal Government and a triple A tenant, they are probably going to stay in the security business . . . ."

In sum, the Tax Court found, as it was free to do upon this record, that whether NSA will decline to renew its leases is presently a matter of conjecture; but so long as it continues to occupy the buildings, the rental income remains a valid basis for capitalization without regard to the so-called "functional obsolescence." Should there be a termination of the leases, appropriate allowance for renovation costs may be sought at that time.

We think that "... a reasoning mind reasonably could have reached the factual conclusion[s] . . ." of the Maryland Tax Court; and that to sustain any of the contentions advanced by appellants would require "... either judicial fact-finding or a substitution of judicial judgment for agency judgment. . . ."

*Order affirmed; appellants to pay costs.*