AMERICAN RADIO-TELEPHONE SERVICE, INC. *v.*
PUBLIC SERVICE COMMISSION
OF MARYLAND

[No. 25, September Term, 1976.]

*Decided November 3, 1976.*

The cause was argued before DAVIDSON, MELVIN and LISS, JJ.

*Roger D. Redden*, with whom was *Francis X. Wright* on the brief, for appellant.

*James A. Pine*, with whom was *Teresa M. Bay* on the brief, for appellee the Public Service Commission of Maryland. *Henry F. Leonnig* for Radio Communications, Inc., other appellee.

LISS, J., delivered the opinion of the Court.

It was the Bard of Avon who first suggested, "It is a wise father that knows his own child." [1] In this case, the Public Service Commission of Maryland has had greater difficulty in determining the lineage of a "grandfather."

This appeal was noted by American Radio-Telephone Service, Inc. (American) from an order of the Circuit Court for Prince George's County affirming a decision of the Public Service Commission of Maryland (the "Commission"), granting certain "grandfather" operating rights in the mobile radio communications business to Radio Communications, Inc. ("RCI"), a radio common carrier. Appellant was one of several competing radio common carriers who were granted permission to intervene in the proceedings before the Commission. [2]

The source of this controversy was the enactment in 1971 by the Maryland General Assembly of a new section of the Public Service Commission Law — designated as Maryland Code (1957, 1975 Repl. Vol.) Art. 78, § 55A. The new section established the first statutory basis for the comprehensive regulation of radio common carriers in Maryland. [3] Because

---

**1.** Shakespeare, "Merchant of Venice," Act II, Scene 11, L. 83.

**2.** All other intervenors have withdrawn from the proceedings.

**3.** Radio common carriers provide a mobile communications service either by two-way transmission or one-way signaling.

several companies were already doing business as radio common carriers in Maryland, the General Assembly provided a "grandfather" clause, codified as subsection (b) of Section 55A, which states:

"Any company not presently franchised or certificated by the Commission as a radio common carrier but engaged in the operation of any radio common carrier system licensed by the Federal Communications Commission on July 1, 1971, shall, upon qualification as a public service company, receive a certificate of convenience and necessity from the Commission authorizing the company to continue the operation of the radio common carrier in the territory professed to be served by that company on July 1, 1971, if, within ninety days after July 1, 1971, that company shall file with the Commission an application for the certificate, including copies of any license or licenses issued by the Federal Communications Commission to that company, showing the area professed to be served by that company."

In September of 1971, RCI filed an application with the Commission for a certificate of convenience and necessity, under subsection (b), which would authorize its operation of a radio common carrier system in an area that included Baltimore City and all Maryland counties except Allegany, Garrett and Worcester. Hearings were held before the Commission; and in February, 1972, the Commission by Order No. 59659 granted RCI a certificate of convenience and necessity authorizing it to engage in the radio communications business in Montgomery, Calvert, Prince George's and St. Mary's Counties in addition to portions of seven other counties. In determining the area which RCI might serve, the Commission used as its guide a plotted contour line known as the 37 dbu (decibel units) line plus 5 miles, and from this line, they determined the "reliable service area" of RCI.[4]

---

4. "Reliable service area" designates an area in which service is generally expected to have an average reliability of not less than 90 per cent.

RCI appealed to the Circuit Court for Prince George's County which affirmed the Commission.

An appeal was noted to the Maryland Court of Appeals, *Radio Communications Inc. v. Public Service Commission of Maryland*, 271 Md. 82, 314 A. 2d 118 (1974), raising the issue of what the legislature intended as the standard for carriers seeking "grandfather" rights under Sec. 55A. Judge Levine, speaking for that Court, said at page 95-96:

> "We read subsection (b) to say that those who assert 'grandfather' status cannot obtain certification by merely 'professing to serve' a given area or county. Subsection (b) provides for certification of a radio common carrier *'engaged in the operation* of. any radio common carrier system . . . .' By obtaining certification, a carrier is expected *'. . . to continue the operation* . . . in the territory professed to be served . . . .' Thus, when the application of a subsection (b) radio common carrier professing to have served an area is challenged, that carrier must then prove that, in fact, it did serve that area, i.e., that on July 1, 1971, it was 'engaged in the operation' of a radio common carrier system in each subdivision for which certification is sought. As we have already held, that requirement may not be embellished with any other standard not found in the language of subsection (b) itself." (emphasis in original).

At page 96, the Court remanded the case to the Commission:

> " . . . for further proceedings, including the introduction of such additional evidence as the Commission may require, in order that RCI may be afforded the opportunity of establishing in what areas it did actually provide service, and for which it seeks certification under subsection (b) [of § 55A of the PSC Law]; and so that intervenors may have the opportunity to present contrary evidence."

On remand, the Commission assigned its Chief Hearing Examiner, Wilson B. Stringer, to hold hearings on any

additional evidence which might be offered. A pre-hearing conference was held in May of 1974, and the parties agreed that the record of the 1971 hearings "would be considered in making a recommended report to the Commission." The Examiner also issued a ruling in which he determined:

" . . . that additional evidence is to be presented by the Applicant [RCI] to show that operations were established for a representative period prior to and including July 1, 1971 in the areas that it professed to serve prior to July 1, 1971. Such additional evidence should include, but need not be limited, to: 1) the number of customers served in each area; 2) the frequency of service for such customers; and 3) the geographical scope of such operations by customers within such areas. In this regard, an area should be considered a county or a geographically defined portion of a county.

"The guidelines for furnishing additional evidence do not preclude the Applicant from putting on such other additional evidence as it believes is necessary to support its application."

At the 1971 hearing, the only witness for RCI was its president, Boyd King (King), who testified that the company operated five base stations on July 1, 1971: two at Bethesda, and one each at Prince Frederick, Upper Marlboro and Annapolis. Maps were introduced with circles indicating the area in which RCI transmitted and received communications signals to and from mobile units. The circles were drawn on the basis of where RCI could "put" a signal and could communicate with mobile units from that particular base station. It was in this manner, King claimed, that RCI transmitted and received signals in the 21 subdivisions for which it sought certification under the "grandfather" clause. He further stated that expansion of RCI from its original seven service areas was the result of a change from low to high power transmitters and significant increases in antenna height.

The intervenors at the 1971 hearing presented the

testimony of a radio engineer, John E. Dettra, Jr. (Dettra), whose evidence consisted of an explanation of the "reliable service area" of a radio common carrier and the technical determination of the plotted contour line known as 37 dbu. He produced maps to support his contention that RCI could not render "reasonably adequate" service in the 21 subdivisions for which it requested certification but conceded that it could do so in parts of the counties of Dorchester, Frederick, Kent, Queen Anne's, Talbot, and Wicomico, in addition to the seven counties it had served since its original entry into the radio communications business in 1963.

Three witnesses testified for RCI at the evidentiary hearings before the Examiner in early 1975: Mrs. Margaret King (Mrs. King), Boyd King, and Paul Woofter (Woofter), a customer of RCI. Mrs. King stated that she was the secretary of RCI as well as its principal radio operator during the year preceding July 1, 1971, and that her testimony was based on the records she kept as well as her actual experience with customers during that period. She stated that calls were logged by telephone number, mobile number, and the time of the beginning and end of each call; and that during the period in question, some 30,000 call tickets had been retained which she had reviewed and compiled; that in those instances where she did not know where the mobile unit or caller was located at the time of the transmission, she included the call amongst those from the area of that unit's regular operation — which was known to her because of her experience as principal operator; that her review of the call tickets covered approximately three-quarters of each month's tickets and that the tickets listed only completed calls or calls where messages were left. Using this information, she compiled an exhibit listing the calls by the counties where they occurred; this compilation was introduced as Petitioner's Exhibit 1. A second exhibit, Petitioner's Exhibit 2, gave the total of calls handled for the years 1969 (15,290 calls), 1970 (21,083 calls), and 1971 (42,593 calls). Exhibit 3 listed RCI's subscribers by billing address, base of operations, and scope of operations. The first two

items in this exhibit were developed from RCI's records; the last was determined by Mrs. King from her knowledge of the customer's business operations. She gave as a specific example RCI's experience with the Baltimore Gas and Electric Company: that corporation's billing address was Baltimore City, but it used RCI's service in connection with the erection of the Calvert Cliffs nuclear plant, which required calls not only in Calvert County and Baltimore City but in all the counties where the employee's duties required him to go. To the same effect was her testimony regarding a tree trimming company doing business in Calvert, Prince George's, and Anne Arundel counties, as well as an engineering company whose employees used RCI's service from Laurel, Maryland to the Pennsylvania line during the 1970-71 period, when the company was constructing a transmission line. Her testimony included statements as to service in Frederick and Hagerstown. She said she was able to be specific about the location of her customers because in many instances they would advise her in advance where they would be so that she would know the proper channel to use in order to reach them.

King, in his testimony, reiterated the statements he made at the 1971 hearings, and he submitted again the exhibits he had offered at that hearing.

Woofter made affidavit as to certain facts within his personal knowledge, which was admitted into evidence. On cross-examination, he substantiated service by RCI in Baltimore, Harford, Howard, Anne Arundel, Montgomery, Prince George's, Calvert, Frederick, and Queen Anne's Counties, as well as in Baltimore City.

Over objection, the Examiner admitted into evidence affidavits of two customers of RCI who were not made available for cross examination. One was made by an employee of the Gas and Electric Company, who stated that in the period between July 1, 1970, and June 30, 1971, he utilized RCI's services in connection with his employment in Calvert, Anne Arundel, Prince George's, and Baltimore County, as well as in Baltimore City, Queen Anne's, Talbot,

Dorchester, St. Mary's, Charles and Howard Counties. The other affidavit, made by Morgan Wayson, Jr., stated that his company had used RCI's service while engaged in construction activities in St. Mary's, Calvert, Charles, Prince George's, Anne Arundel, Montgomery, Howard and Baltimore Counties and in Baltimore City, Frederick, Queen Anne's and Talbot Counties.

Appellant offered as its principal witness Graham Randolph (Randolph), vice president of American, whose testimony was based on a presentation of certain map overlays which he had prepared depicting the territorial scope of RCI's operation in 1971: One overlay outlined the seven counties RCI had been authorized to serve by the original order of the Commission in 1963 (Howard, Montgomery, Anne Arundel, Prince George's, Charles, Calvert and St. Mary's). The second overlay, based on the information presented in Applicant's Exhibit 3 about the "base of operations" of RCI's customers, indicated that 94.6 per cent of RCI's 1970-71 customers were encompassed in six of these counties, i.e., in all but Howard. The third overlay showed the areas from which a person could reach one of RCI's message centers by a toll-free phone call. The fourth overlay showed the "37 dbu contours" of RCI's transmitting stations as they existed on July 1, 1971. Randolph in addition offered testimony which tended to contradict that of Mrs. King concerning service allegedly used by two purported customers (Colby and Cade) in the crucial time period.

The appellant offered as an additional witness Arthur Blooston, a lawyer who specializes in telecommunications matters before the Federal Communications Commission (FCC) and the courts; and his testimony concerned the criteria used by the FCC in defining the service area of radio communications carriers and the constraints upon and privileges exercised by such carriers under an FCC license.

The Chief Hearing Examiner thereafter filed a report and recommendation in which he adopted a line of demarcation of the service area of RCI that coincided with the

"interference contours" [5] which prescribed the area in which RCI was actually engaged in the operation of a radio common carrier system in 1971. He stated:

"These contours encompass the substantiated testimony of service to Harper's Ferry, West Virginia, and Frederick, Baltimore, Harford, Queen Anne's, and Dorchester Counties. And, while Mr. King's testimony of service to subscribers in Carroll and Washington Counties was not supported by other evidence, the southern portion of Carroll County (including Westminster) and the southern portion of Washington County lie within the interference contour of RCI's Bethesda station. Therefore, these areas, which lie between the evidentiary supported portions of Baltimore and Frederick Counties, should be included within RCI's area of certification. In the same way, Mrs. King's testimony of service to portions of Kent, Wicomico, Somerset, and Caroline Counties can be supported by these counties' positions between evidentiary supported areas and by the interference contours of RCI's Annapolis and Prince Frederick stations."

On the basis of these findings, the Examiner recommended:

" . . . that Radio Communications, Inc. be granted a Certificate of Convenience and Necessity for the continued operation of a radio common carrier system in the following counties in their entirety: Anne Arundel, Calvert, Charles, Howard, Montgomery, Prince George's, St. Mary's, Talbot, and in Baltimore City; and portions of Washington, Frederick, Carroll, Baltimore, Harford, Kent, Queen Anne's, Caroline, Wicomico, Somerset, and Dorchester Counties, in accordance with the

---

5. When two stations are utilizing the same channel and the signal given out by one is such as to interfere with or overcome the competing signal, it becomes necessary to determine the "interference contour." The interference contour is calculated to guarantee to any co-channeled station the required protection of 90 per cent reliability of its signal.

> delineations on maps which are in evidence in this proceeding as Docket No. 26, representing the interference contours of Radio Communications, Inc."

Thereafter, the Commission passed an Order in which it "adopted as its own" the findings and recommendations of the Examiner. Appellant appealed to the Circuit Court for Prince George's County (Powers, C. J., presiding), where the Commission's order was affirmed. It is from this ruling that the instant appeal was filed.

The principal question to be determined by this Court is whether Chief Judge Powers was correct in finding that the Commission's order was supported by substantial evidence on the record considered as a whole. After a thorough and painstaking review of the voluminous record, we agree with Judge Powers and shall affirm.

In the interest of finally determining this long drawn out litigation, we shall consider and rule on the basic legal and factual questions involved in this proceeding.

The scope of judicial review of orders of the Commission is governed by § 97 of the Public Service Commission statute, *supra.* It provides in pertinent part:

> "Every final decision . . . of the Commission shall be prima facie correct and shall be affirmed unless clearly shown to be . . . (3) made upon unlawful procedure, or (4) arbitrary or capricious, or (5) affected by other error of law, or (6) if the subject of review is an order entered in a contested case after hearing, such order is unsupported by substantial evidence on the record considered as a whole."

The guidelines for applying the substantial evidence test are set out in *State Insurance Commissioner v. National Bureau of Casualty Underwriters*, 248 Md. 292, 309-10, 236 A. 2d 282, 291-92 (1967):

> "Whichever of the recognized tests the court uses — substantiality of the evidence on the record as a

whole, clearly erroneous, fairly debatable or against the weight or preponderance of the evidence on the entire record — its appraisal or evaluation must be of the agency's fact-finding results *and not an independent original estimate of or decision on the evidence.* The required process is difficult to precisely articulate but it is plain that it requires restrained and disciplined judicial judgment so as not to interfere with the agency's factual conclusions under any of the tests, all of which are similar. There are differences but they are slight and under any of the standards *the judicial review essentially should be limited to whether a reasoning mind reasonably could have reached the factual conclusion the agency reached.* This need not and must not be either judicial fact-finding or a substitution of judicial judgment for agency judgment." (emphasis supplied, citations omitted).

*Public Service Commission of Maryland v. Baltimore Gas & Electric Co.*, 273 Md. 357, 362-63, 329 A.2d 691, 695 (1974).

In the oft quoted words of Chief Justice Hughes in *Consolidated Edison Co. v. NLRB*, 305 U. S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 126, 140 (1938): "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." (citations omitted).

The question before us, then, is whether from our own review of the record, we are convinced that there was substantial evidence to support the Examiner's conclusion and the Commission's order?

The Kings offered voluminous business records of some 30,000 calls received in the test period of 1970-1971. They offered evidence of substantial increases in the utilization of their services from the time they began their business to the period considered by the Commission. At least a portion of their service area was conceded correct and is not before us as a contested area. Their testimony, if believed, established calls to and from each of the areas included in the

Commission's order. In many of these areas, customer's billing and business addresses coincided with the area claimed to be served. In almost every instance, there was testimony as to the scope of a customer's business which would tend to substantiate that service was rendered within the area in which it was offered. Woofter's testimony in a number of instances corroborated the Kings' testimony. It is true that appellant offered evidence which tended to contradict or weaken the effectiveness of the Kings' testimony, but this disparity raised the issue of the weight to be given to that testimony, and this was resolved by the Examiner's conclusions in his report. Appellant complains that it was improper for the Examiner to use the interference contour lines to determine the territory in which RCI was entitled to "grandfather" rights. Our own examination of the line as drawn on the schematic presentation of the RCI service area contours, in the appendix to appellant's reply brief, convinces us that it is a logical method of delineating the area. In effect, the Commission has located on the map those areas actually served by RCI and has used the interference contour line as the boundary connecting these points; this has resulted in a reduction of the area which RCI might be authorized to serve had the Commission accepted county lines as the points of demarcation. We find no objection to the utilization of the interference contours to establish — not the area served — but rather its outer limits.

Appellant makes one other objection which has some merit: it complains that the Examiner should not have admitted the affidavits of two witnesses who purported to substantiate the Kings' testimony regarding their utilization of RCI's facilities, when these witnesses were not made available for cross-examination, albeit appellant made reasonable efforts to obtain their attendance (One of the witnesses was on vacation in Florida; the other had not been summoned.).

Although administrative agencies are not bound by the technical common law rules of evidence, they must observe the basic rules of fairness as to parties appearing before

them. *Dickinson-Tidewater, Inc. v. Supervisor of Assessments*, 273 Md. 245, 253, 329 A. 2d 18 (1974). One of these basic rules of fairness is that in an adversary proceeding before an administrative board, the opportunity for reasonable cross-examination must be allowed. *Hyson v. Montgomery County Council*, 242 Md. 55, 67, 217 A. 2d 578 (1966).

The Rules of Practice and Procedure of the Public Service Commission of Maryland (1910), provide for the acceptance of affidavits under certain circumstances. Rule IV2 provides:

> "Except where stipulations are filed as above, the witnesses whose testimony may be desired at any hearing, investigation or proceeding before the Commission, or before any one of the Commissioners, as authorized by Section 7 of the Public Service Commission Law, shall testify orally and under oath, unless the Commission or Commissioner for good cause shown deems it proper in special cases that written evidence, under affidavit or otherwise, be submitted."

We believe, under the circumstances, that the affidavits should not have been admitted unless the witnesses were made available for cross-examination; however, we find that there was error without harm. Although Appellant objected to the admissibility of the affidavits, it made no request for a postponement or for an oppportunity to bring the affiants in for cross-examination. The Examiner admitted the affidavits into evidence with the statement that they "would not be given the same weight as if the people were cross-examined." The information in the affidavits was established by other competent evidence, if believed. The evidence of service by RCI which the affidavits were used to corroborate — that is King's testimony of RCI's service in St. Mary's, Calvert, Charles, Talbot, and Dorchester Counties — was not contradicted by the appellant: appellant conceded RCI's service in the first three counties mentioned on July 1, 1971; and appellant's expert witness, Dettra, had testified at the original hearing in 1971 as to RCI's ability to

serve Talbot and Dorchester Counties. All five of the counties were included in the Commission's original order granting "grandfather" rights to RCI in 1971, and the order was not contested by American at that time.

The record in this case contains hundreds of pages of testimony, innumerable exhibits and maps, and reams of legal and factual argument. The two affidavits taken together amount to an infinitesimal portion of the total information available to the Examiner in reaching his conclusion. We hold, therefore, that the Examiner erred in admitting the affidavits without some provision for cross-examination but that under all the circumstances, no prejudice resulted.

*Order affirmed.*
*Costs to be paid by appellant.*