877 A.2d 1111

**Howard L. ROSOV, D.D.S.**

v.

**MARYLAND STATE BOARD OF DENTAL EXAMINERS.**

No. 540, Sept. Term, 2004.

Court of Special Appeals of Maryland.

July 6, 2005.

---

100

Pamela J. Diedrick, (Roy L. Mason, Mason, Cawood & Hobbs, PA on the brief), Annapolis, for Appellant.

Richard N. Bloom (J. Joseph Curran, Jr., Atty. Gen. on the brief), Baltimore, for Appellee.

Panel: SALMON, SHARER, WILLIAM W. WENNER (Retired, Specially Assigned) JJ.

SHARER, Judge.

The Maryland State Board of Dental Examiners ("the Board") issued an Order on February 4, 2004, that the license to practice dentistry of appellant, Howard L. Rosov, D.D.S., be permanently revoked for violations of the Maryland Dentistry Act ("the Act").[1] Appellant sought judicial review in the Circuit Court for Anne Arundel County, following which that court affirmed the decision of the Board.

---

1. Md.Code Ann., Health Occ. §§ 4–101 *et seq.* (2000 Repl.Vol. & 2004 Supp.).

Appellant presents for our review one issue, which, slightly recast, is:

Whether the circuit court erred in affirming the decision of the Maryland State Board of Dental Examiners finding that appellant violated the Maryland Dentistry Act, without substantial evidence and in reliance upon the Administrative Law Judge's proposed decision that included errors of law.

We agree with the circuit court that the ALJ committed no errors of law, and that the evidence was sufficient to support the Board's decision. Therefore, we shall affirm.

### FACTUAL and PROCEDURAL HISTORY

Appellant has been a licensed dentist in the State of Maryland since 1973, and engaged in a practice as a specialist in endodontics, with offices in Annapolis and Glen Burnie.

Rosov is not a stranger to the Board, having been disciplined on other occasions prior to the events that gave rise to the instant case. The history of Board interventions includes:

In 1996, he was charged with multiple violations of the Act.

In 1998, he entered into a consent order to resolve all disciplinary matters then pending, including the 1996 violations, under the terms of which he was placed on probation for three years for violation of the Act involving conduct that included the failure to properly record treatments; failing to inform patients of treatment alternatives; failing to record anesthesia administered; and failing to record information about medications administered or prescribed, including type, amount, dosage, and/or duration.

On October 8, 2002, the Board summarily suspended his license after investigation of two patient complaints. A resulting Board inspection of his dental office showed numerous and significant violations of Center for Disease Control ("CDC") Guidelines for universal precautions.[2] At a show cause hear-

---

2. The CDC Guidelines are incorporated into the regulation of the practice of dentistry in Maryland. *See* Md.Code, Health Occ. § 4–205(a)(6)("On receipt of a written and signed complaint, including a

ing on October 23, 2002, Rosov represented that, as a result of the summary suspension, he had obtained consultation and training regarding his infection control practices and that the infection control errors had been remediated. Accepting his explanation, the Board stayed the summary suspension until December 31, 2003, pending Rosov's compliance with, and completion of, certain conditions, including the observation of his practice by an expert in CDC compliance, and inspections of his dental practice throughout 2002 and 2003.

Rosov's license was again summarily suspended by the Board on June 18, 2003, following an investigation that gave rise to the current litigation. The incident that spurred the latest investigation involved a "needle stick" in his treatment of a minor patient.

### Patient "A"[3]

On February 26, 2003, Patient A, an 11 year old female, went with her mother to Rosov's Glen Burnie office for root canal therapy on one tooth.[4] After the root canal procedure, Rosov recommended, and Patient A's mother agreed to, the extraction of one of Patient A's baby teeth.

Rosov picked up a syringe containing the anesthetic Lidocain, which had been used for the root canal therapy. After the initial use, the syringe had been recapped and returned to

referral from the Commissioner of Labor and Industry, [the State Board of Dental Examiners may] conduct an unannounced inspection of the office of a dentist . . . to determine compliance at that office with the Centers for Disease Control's guidelines on universal precautions[.]"); Code of Maryland Regulations ("COMAR") 10.44.19.08(11) (2005) (Penalties for Violations of These Regulations—"Subject to the hearing provisions of this chapter, the Board [of Dental Examiners] may reprimand any certified radiation technologist . . . if the holder of the certificate . . . Except in an emergency life-threatening situation where it is not feasible or practicable, fails to comply with the Center for Disease Control's guidelines on universal precautions[.]").

**3.** Both the ALJ and the Board refer to the minor patient as "Patient A" throughout their reports and opinions. We shall do likewise.

**4.** Rosov did not clearly record the type or amount of the anesthetic used during the treatment.

the tray. The child was upset and began to cry, so Rosov asked his dental assistant Kimberly Hickman to help calm the patient. At the time, the patient was seated in the dental chair and Hickman was standing to her left; Rosov was sitting on Patient A's right side, to the rear. Hickman then stood to the right of Rosov, near Patient A's leg, holding her hand.

When Rosov attempted to inject Patient A with the syringe, she moved frantically. As Rosov pulled the needle away from Patient A's mouth, his hand holding the syringe went in a downward motion to his right side and came into contact with Hickman's left leg, sticking her in the left thigh. Hickman reacted by saying "ouch." Rosov immediately thereafter injected Patient A with the same needle which had stuck Hickman. Patient A's mother, hearing crying, returned to the room, and it was decided not to proceed with the extraction.[5] The mother was not told about the needle stick incident before she left the office.

After having been stuck with the needle, Hickman went into the bathroom. Thereafter, she informed her co-worker, Stephanie Howard, that she had a red mark on her leg as a result of the stick. Howard advised Hickman to tell Rosov about the needle stick, but she did not. Nor, did she see a physician or follow CDC protocol for management of injuries.

As we shall discuss, *infra*, no complaint was made to the Board about the incident. Rather, the Board staff became aware as a result of a newspaper article in which the mother of Patient A had been quoted.

The Board summarized the basis for its summary suspension:

numerous ongoing and repetitive CDC violations as well as the treatment of a particular patient during an episode in which the following was alleged to have occurred: Dr. Rosov attempted to inject Patient A [child patient whose identity was withheld], stuck his dental assistant, KH, with

---

**5.** Data about the attempted extraction was not recorded in Patient A's chart.

the same needle when the patient started struggling, and finally used the same needle to inject Patient A.

(Footnote omitted.)

The Board conducted a Show Cause Hearing on July 2, 2003, to consider (1) Rosov's representations that the CDC violations had been ameliorated; and (2) affidavits regarding the needle stick incident. Thereafter, the Board stayed the summary suspension pending the outcome of an evidentiary hearing.

On the same day, the Board filed charges against Rosov alleging that he had violated multiple provisions of the Maryland Dentistry Act, specifically, Health Occupations § 4-315(a)(6), (11), (16), (18), (20) and (28). The Board delegated to the Office of Administrative Hearings (OAH) the authority to conduct an administrative hearing and to issue proposed findings of fact and conclusions of law.

The OAH conducted a six-day, contested, evidentiary hearing in August 2003, at which the ALJ heard from 11 lay and expert witnesses and considered more than 70 exhibits. The ALJ issued a proposed decision on September 29, 2003, finding that Rosov violated the Maryland Dentistry Act by:

Practicing dentistry in a professionally incompetent manner or in a grossly incompetent manner in violation of Health Occ. § 4-315(a)(6);

Behav[ing] dishonorably or unprofessionally or violated a code of ethics pertaining to the dentistry profession pursuant to Health Occ. § 4-315(a)(16); willfully made or filed a false report or record in the practice of dentistry pursuant to Health Occ. § 4-315(a)(20);

Fail[ing] to comply with the CDC guidelines for universal precautions pursuant to Health Occ. § 4-315(a)(28);

Permitt[ing] unauthorized individuals to practice dentistry under his supervision in violation of Health Occ. § 4-315(a)(11);

Violat[ing] rules and regulations adopted by the Board, pursuant to Health Occ. § 4-315(a)(18).

The enumerated violations, the Board found, were based on a "wide spectrum of conduct ... involving the treatment of a minor patient ... and numerous other ongoing actions and omissions in his practice of dentistry generally."

More specifically, the ALJ found violations by a preponderance of the evidence, and which were cited by the Board in its final order, as follows:

1. Failing to record the type and amount of anesthetic used;

* * *

3. Failing to record the attempted extraction;
4. Failing to record the need for a gingivectomy;
5. Injecting the patient with a needle that had just stuck another person;
6. Failing to act appropriately in response to exposure incident;
7. Failing to follow post-exposure protocols;
8. Transporting contaminated instruments, including sharps, in a duffel bag;
9. Providing misleading and false information to the minor patient's mother;
10. Providing misleading and false information to the Board;
11. Failing to provide the Board, pursuant to its subpoena, the March 4, 2003 letter from Rosov to the minor patient's mother;
12. Directing two of his dental assistants to place and/or expose radiographs, without direct clinical supervision, when they were not certified by the Board as dental radiation technologists and were not acting in accordance with an educational program approved by the Board;
13. Failing to use the timer on the autoclave to time sterilization cycles;

14. Reducing the amount of time on the timer mid-cycle of the autoclave;

15. Failing to replace immediately a broken autoclave and using non-sterile instruments during the period when the autoclave was broken;

16. Using an instrument he had used in a patient's mouth to obtain additional Cavit [Cavit is a substance used as a temporary filling material in dental procedures] or topical anesthetic from the main supply, thereby contaminating the contents in the drawer and further contaminating the instrument he continued to use on the patient;

17. Retrieving unexposed, contaminated x-ray film packets from the bio-hazardous waste container and placing them into treatment room drawers for later use on patients;

18. Stomping down bio-hazardous waste in a container with his foot;

19. Pulling Cavit, which had stuck to his shoe after stomping bio-hazardous waste, off of his shoe with gloved hands and then proceeding to treat a patient wearing the same gloves;

20. Re-using dirty gloves;

21. Other failures and omissions evident at the time of various inspections by a CDC consultant, as follows:

 a. *October 14, 2002*—failing to maintain complete written office protocols for Bloodborne Pathogen, Hazard Communication and the Universal Precautions Standards; failing to have available verifiable sterilization of instruments, handpieces, endodontic files and burs;

 b. *October 22, 2002*—failing to maintain a complete written exposure control plan;

 c. *October 25, 2002*—failing to complete the organization of the sterilization and prep areas;

 d. *October 28, 2002*—placing and/or storing multiple bags of instruments in treatment drawers and instru-

ment storage baskets with process monitors incompletely processed or entirely unprocessed; attempting to re-cap a needle using the two-hand technique; attempting to use a contaminated instrument to get Cavit from the main source;

e. *December 23, 2002*—placing and/or storing multiple bags of instruments in treatment drawers and instrument storage baskets with process monitors incompletely processed or entirely unprocessed;

f. *May 5, 2002*—placing and/or storing multiple bags of instruments in treatment drawers and instrument storage baskets with process monitors incompletely processed or entirely unprocessed; placing inverted latex gloves in his lab coat pocket; failing to make available staff training documents for a new employee; failing to use heavy duty gloves for processing instruments; allowing the bio-hazardous box to overflow with waste; allowing the continued unreliable operation of the autoclave.

Rosov and the State filed exceptions to the ALJ's proposed decision, and an exceptions hearing was held on December 3, 2003. In consideration of the entire record, the Board, with certain limited exceptions, adopted the proposed decision of the ALJ, and incorporated it by reference in its Final Order that permanent revocation of Rosov's dental license was necessary to protect the public. This appeal followed.

## DISCUSSION

### Standard of Review

The standard of appellate review of administrative agency decisions requires us to review the decision of the agency, not of the circuit court. *Dep't of Health & Mental Hygiene v. Shrieves*, 100 Md.App. 283, 303–04, 641 A.2d 899 (1994). "Judicial review of administrative agency action is narrow." *Mayer v. Montgomery County*, 143 Md.App. 261, 270, 794 A.2d 704 (2002)(quoting *United Parcel Serv. v. Peo-*

*ple's Counsel for Baltimore County,* 336 Md. 569, 576, 650 A.2d 226 (1994)).

To the extent that issues on appeal turn on the correctness of an agency's findings of fact, such findings must be reviewed under the substantial evidence test. *[Dept. of Human Resources v. Thompson,* 103 Md.App. 175, 190, 652 A.2d 1183 (1995) ] (citing *State Election Bd. v. Billhimer,* 314 Md. 46, 58–59, 548 A.2d 819 (1988)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 191, 652 A.2d 1183 (quoting *Caucus Distributors, Inc. v. Md. Securities Comm'r,* 320 Md. 313, 323–24, 577 A.2d 783 (1990)). *See also Relay Improvement Ass'n v. Sycamore Realty Co., Inc.,* 105 Md.App. 701, 714, 661 A.2d 182 (1995), *aff'd,* 344 Md. 57, 684 A.2d 1331 (1996) (stating that "substantial evidence means more than a 'scintilla of evidence,' such that a reasonable person could come to more than one conclusion."). In other words, the question on appeal becomes whether a reasoning mind could reasonably have reached the agency's factual conclusion. *[Eberle v. Baltimore County,* 103 Md.App. 160, 166, 652 A.2d 1175 (1995) ]. We may not uphold the agency's decision " 'unless it is sustainable on the agency's findings and for the reasons stated by the agency.' " *United Parcel Serv., Inc. v. People's Counsel,* 336 Md. 569, 577, 650 A.2d 226 (1994) (quoting *United Steelworkers v. Bethlehem Steel,* 298 Md. 665, 472 A.2d 62 (1984)).

*Maryland State Dept. of Educ. v. Shoop,* 119 Md.App. 181, 196–97, 704 A.2d 499 (1998).

We may affirm the decision of the agency, or remand the matter for further proceedings, or reverse or modify the decision if any substantial right of the petitioner has been prejudiced because a finding, conclusion, or decision

(i) is unconstitutional;

(ii) exceeds the statutory authority or jurisdiction of the final decision maker;

(iii) results from an unlawful procedure;

(iv) is affected by any other error of law;

(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or

(vi) is arbitrary or capricious.

Md.Code Ann., State Gov't § 10–222(h) (1999 Repl.Vol.).

As we have noted, the charges against appellant were numerous and all were presented to the ALJ and the Board for decision. Nonetheless, appellant devotes his brief and appellate argument to his perceived errors involving the "needle stick" incident, to the virtual exclusion of all the other charges. We shall discuss his arguments in turn.

### The Board's Investigative Report

Maria Bartrem, an investigator employed by the Board, conducted an inquiry and interviewed a number of witnesses. She compiled a confidential report consisting of 12 pages of background and witness statements and interviews. Appended to the report were 341 pages of records, reports, and other documents that had been generated as a result of the "needle stick" incident, and other incidents.[6]

Rosov argues that the Bartrem report was biased and included non-evidentiary, inadmissible, and highly prejudicial material.[7] He alleges errors of law by the ALJ in reliance on the report because his counsel did not have access to the author during the investigation (as did the Board staff) and because Bartrem was not available for cross-examination.

Preliminarily we note that Rosov's allegation that *all* references in Bartrem's report to his closed cases before the Board were improper and prejudicial must fail. His counsel commented before the ALJ:

---

6. Appellant, we think misleadingly, refers to the document as a "300 page report" when, in fact, the report itself consisted of only 12 pages.

7. Bartrem was no longer an employee of the Board at the time of the hearing and did not testify. Rosov's claim that Bartrem was "mysteriously" no longer employed by the Board at the time of his hearing is no more than unfounded speculation, and is not supported by the record.

I don't have any objection to—those are in the final order of November 20, 2002, final decision and order, that the inspections and unannounced visits and that had—I'm not objecting.

What I'm objecting to is everything that came before that, 1998, 1996, the termination of his probation, the summary suspension in October, and the transcript of the Show Cause hearing in October.

 If a party fails to object, "he will not later be heard to complain that the evidence should not have been admitted." *Ginn v. Farley,* 43 Md.App. 229, 236–37, 403 A.2d 858 (1979) (quoting *Baltimore & Ohio R.R. v. Black,* 107 Md. 642, 658, 69 A. 439 (1908)). Therefore, we consider any appellate objection by Rosov to the acknowledgment of disciplinary actions subsequent to 1998 to have been waived.[8]

Section 10–213 of the State Government Article of the Maryland Code Annotated governs the admissibility of evidence in administrative proceedings:

(a)(1) Each party in a contested case shall offer all of the evidence that the party wishes to have made part of the record.

(2) If the agency has any evidence that the agency wishes to use in adjudicating the contested case, the agency shall make the evidence part of the record.

(b) The presiding officer may admit probative evidence that reasonable and prudent individuals commonly accept in the conduct of their affairs and give probative effect to that evidence.

(c) Evidence may not be excluded solely on the basis that it is hearsay.

(d) The presiding officer may exclude evidence that is:

(1) incompetent;

(2) irrelevant;

---

**8.** The ALJ did allow Rosov's license history to be admitted. Also admitted was the consent order signed by him pertaining to the 1996 charges, although the 1996 charging document was not admitted.

(3) immaterial; or

(4) unduly repetitious.

(e) The presiding officer shall apply a privilege that law recognizes.

(f) On a genuine issue in a contested case, each party is entitled to:

(1) call witnesses;

(2) offer evidence, including rebuttal evidence;

(3) cross-examine any witness that another party or the agency calls; and

(4) present summation and argument.

(g) The presiding officer may receive documentary evidence:

(1) in the form of copies or excerpts; or

(2) by incorporation by reference.

(h)(1) The agency or the Office may take official notice of a fact that is:

(i) judicially noticeable; or

(ii) general, technical, or scientific and within the specialized knowledge of the agency.

(2) Before taking official notice of a fact, the presiding officer:

(i) before or during the hearing, by reference in a preliminary report, or otherwise, shall notify each party; and

(ii) shall give each party an opportunity to contest the fact.

(i) The agency or the Office may use its experience, technical competence, and specialized knowledge in the evaluation of evidence.

Md.Code, State Gov't § 10–213.

 Hearsay evidence is admissible before an administrative forum in contested cases and, if such evidence is credible and sufficiently probative, " 'it may be the sole basis for the decision of the administrative body.' " *Fairchild Hil-*

ler Corp. v. Supervisor of Assessments for Washington County, 267 Md. 519, 523, 298 A.2d 148 (1973) (quoting Redding v. Bd. of County Com'rs, 263 Md. 94, 110–11, 282 A.2d 136 (1971)). Administrative agencies, while not required to adhere to technical common law rules of evidence, must observe the basic rules of fairness. Dal Maso v. Bd. of Co. Com'rs, 238 Md. 333, 337, 209 A.2d 62 (citations omitted).

The Court of Appeals explained in Montgomery County v. Stevens, 337 Md. 471, 654 A.2d 877 (1995):

> "[t]he mere exposure to evidence presented in nonadversary investigative procedures is insufficient in itself to impugn the fairness of the Board members at a later adversary hearing.

> \* \* \*

> "It is ... very typical for the members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings. This mode of procedure does not violate the Administrative Procedure Act, and it does not violate due process of law."

Id. at 485, 654 A.2d 877 (quoting Withrow v. Larkin, 421 U.S. 35, 55–56, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975)). We have noted the Supreme Court's reluctance to find the violation of due process rights based on "impermissible blending of adjudicative and investigatory functions." Nationwide Mut. Ins. Co. v. Ins. Com'r, 67 Md.App. 727, 740, 509 A.2d 719 (1986) (citing Withrow, supra ).

The Withrow Court rejected a denial of due process claim, stating

> The contention that the combination of investigation and adjudicative function necessarily creates as unconstitutional risk of bias is administrative adjudication has a much more difficult burden of persuasion to carry. It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic

appraisal or psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.

*Withrow, supra,* 421 U.S. at 47, 95 S.Ct. 1456.

 Rosov has not met the *Withrow* burden. Rosov refers us to the statement in Bartrem's report that "[Bartrem] and [the State] interviewed [Stephanie] Howard under oath." His complaint is founded upon the fact that his counsel was not present at this interview, that counsel was not permitted to question Stephanie Howard at that time, and that the State unfairly participated in the interviews that were included in the report.

We know of no requirement, either in law or investigative technique, that compels an investigative agency, prior to charging, to include the investigation target or counsel in the interview process. The Board's investigative processes to determine whether charges are justified and sustainable violates neither *Withrow* nor the Administrative Procedure Act. Safeguards were available for Rosov—the interview was taken under oath and Howard was available for cross-examination at the administrative hearing.

 Rosov next alleges that the entire Bartrem report was hearsay, was unauthenticated by the investigator, and would not have been admitted in a judicial trial. We cannot disagree with his conclusion about admissibility in a judicial proceeding. That does not, however, preclude admissibility at the administrative level. Under the relaxed rules of evidence applicable in an administrative hearing, the focus is whether admitted hearsay was credible and sufficiently probative.

Rosov asserts that the report reveals Bartrem's biased viewpoint, and cites "major defects in the manner of the investigation, including the participation of the State but not Dr. Rosov, the documentation of the investigation, the manner of how conclusions were reached, etc." But, he provides no support in the record for his allegation that the investigation

was substantially defective. He presented no evidence that Bartrem's manner of investigation was faulty, nor does the record support such a conclusion. Rosov rests his argument on the fact of Bartrem's employment by the Board and interaction with the staff during the investigation. If that were that the standard, any such report, by any agency charged with the enforcement of professional standards, would be suspect.

The ALJ did not err in admitting the report. A fair reading of the report discloses that it contains summaries of statements made by witnesses, not the opinions of the investigator. All but one of those who were interviewed by the investigator testified at the administrative hearing and were subject to cross-examination, thus curing any harm of hearsay within the report.[9]

Finally, Rosov argues, somewhat disingenuously, that the report should not have been admitted because he did not have the opportunity to cross-examine Bartrem. Of course, he must concede that he did not issue a subpoena for Bartrem to compel her attendance at the administrative hearing. He further asserts that he was not informed that she would not be testifying until the start of the hearing. All of that, he posits, is conclusive that the entire case was "presented by a phantom" due to Bartrem's absence. His assertions are without merit.

Our decision in *Travers v. Baltimore Police Dept.*, 115 Md.App. 395, 693 A.2d 378 (1997), is instructive. Travers, a former Baltimore City police officer, was accused of violating departmental rules and regulations. *Id.* at 400, 693 A.2d 378. He alleged that the administrative trial board erred in admitting hearsay statements of the alleged victim through the testimony of other officers, depriving him of the opportunity to

---

9. Those witnesses include Dr. Melissa Mulreany, reviewer of Rosov's infection control practices in conjunction with a previous order of the Board; the mother of Patient A; Kimberly Hickman; Stephanie Howard; Joyce Burke, instructor of an X-ray course taken by Hickman; and Lori Loveridge, Rosov's office receptionist.

cross-examine the alleged victim. *Id.* at 407–408, 693 A.2d 378. Travers had not subpoenaed the alleged victim. We opined:

> Nonetheless, because appellant failed to exercise his right to subpoena [the victim] *see* Md. Ann.Code, art. 27 § 730(j), we conclude that he has effectively waived his right to complain about a denial of the opportunity to cross-examine [the victim]. In 1971, the Supreme Court in *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), upheld the admission of hearsay evidence in a proceeding before the Social Security Board, noting that Perales's lawyer could have subpoenaed the hearsay declarant but did not do so. *Id.* at 404–05, 91 S.Ct. at 1428–29. Although not citing *Perales*, we held in [*American Radio–Telephone Serv., Inc. v. Public Serv. Comm'n*, 33 Md.App. 423, 365 A.2d 314 (1976)] that the error in admitting affidavits, without subjecting the affiant to cross-examination, was harmless because the opponents "made no request for . . . an opportunity to bring the affiant in for cross-examination." 33 Md.App. at 435, 365 A.2d at 320. . . . We read *Perales* as standing for the proposition that claimants who forgo their right to subpoena known, material witnesses effectively waive any objections to denial of an opportunity to cross-examine. 69 Md.App. at 264, 517 A.2d at 117. We conclude that, in light of appellant's failure to subpoena [the victim] the admission of her statements to Officer Moore and Lieutenant Henderson did not vitiate appellant's right to a fair administrative hearing.

*Id.* at 418–19, 693 A.2d 378 (footnotes omitted) (some citations omitted).

Rosov was not deprived of the opportunity to cross-examine Bartrem by the State or the ALJ, but by his own failure to subpoena the witness.

On the record before us, we find the report sufficiently credible and probative to satisfy its admissibility, even to the extent that it contained hearsay. We find no error.

### Police Report

■ In December 2002, Hickman reported to the police that a theft [10] had occurred in Rosov's office. She reported that she was the first to arrive at the office and discovered property missing. At the administrative hearing, Rosov's attempt to have admitted a copy of the police report of the incident was denied by the ALJ on relevancy grounds.

Rosov argues that, because of the ALJ's ruling, he was prevented from effectively challenging Hickman's credibility. He, and his staff, believe that the report was false and that Hickman was responsible for the missing property. In his brief, he asserts:

Dr. Rosov believes that Ms. Hickman was responsible for the theft occurring in his office. What were the facts? Ms. Hickman called the police, was the only employee present because the office had not yet opened, had her children with her, was not scheduled to work that day, and had borrowed money from Dr. Rosov in the past. There were no thefts after Ms. Hickman left the job. This report was offered by Dr. Rosov for the impeachment of Ms. Hickman. Ms. Hickman was the key witness relied on by the State and yet Dr. Rosov's counsel was not even allowed to cross examine her about this incident.

There was no claim that the police report was false. There was no claim that the crime did not occur. Dr. Rosov and his employees suspected Ms. Hickman. She "discovered" the crime. She was in the office with her children before the office opened and on a day she was not scheduled to work. The crime occurred around the holidays and it was known that she had financial difficulties. Further, it was later discovered that she had prior criminal allegations. This was substantial evidence that should have been permit-

10. In his brief, appellant characterizes the event as a "robbery." Since there is no suggestion that the property was taken from a person by the use of force, or under threat of force, we assume that the offense was, in fact, a theft, perhaps occurring in the course of a statutory burglary.

ted into evidence to impeach Ms. Hickman and demonstrate her motivation to lie.

Maryland Rule 5–401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evidence that is not relevant is inadmissible. Md. Rule 5–402 (2005). Admissible evidence is evidence "relevant to the issues in the case and tends to either establish or disprove them." *Parker v. State*, 156 Md.App. 252, 268, 846 A.2d 485 (2004) (citing *Dorsey v. State*, 276 Md. 638, 643, 350 A.2d 665 (1976)). " 'Evidentiary rulings, particularly those hinging on relevance, are entrusted to the discretion of the trial judge'; an appellate court will not second-guess a decision as to the relevancy of evidence 'absent a clear abuse of the trial judge's discretion.' " *Id.* (quoting *Jeffries v. State*, 113 Md.App. 322, 339, 688 A.2d 16 (1997) (citations omitted)).

The Board in its Final Order found that "the [police] report did not provide a specific instance of the witness' conduct." Rather, "Dr. Rosov attempted to rely upon an inference to be drawn from the combination of the police report that a theft had occurred and an affidavit of another witness that employees believed that [Hickman] was responsible for this theft." Rosov cites many factors that he believes confer relevancy to the police report, and thus relevant to Hickman's credibility, including her documented history of perhaps unlawful conduct, that she was suspected of being involved with the theft from the office, and that she had a documented history of financial irresponsibility.

In the end, there is no proof that Hickman was involved in the theft, only speculation among employees. No charges were ever brought against her for the theft. Rosov failed to provide any foundation that would have justified the admission of the police report to impeach Hickman's credibility. His assertions are no more than rank speculation.

Rosov's argument that every charge against him was based on the underlying claims of Hickman is inaccurate. Clearly,

the Bartrem report, the testimony and observations of Dr. Mulreany, and other expert and lay testimony indicate otherwise. And, we reiterate, appellant fails to address the other, abundant, charges that he was called to answer.

### Personnel Records

Rosov sought to obtain, and to admit, personnel records from Hickman's employment with another doctor. The thrust of his argument is that, "upon information and belief," Hickman was terminated from that employment for dishonesty, and therefore, the records were relevant to her credibility. Rosov provided no support for his argument, other than his speculation that the records contained proof of an alleged termination for dishonesty. He admitted that he had never viewed the record. The ALJ committed no error in denying the admissibility of the proffered evidence.

### The Case Sub Judice

■■■ Section 4–315 of the Health Occupations Article governs license denial, suspension, or revocation, and provides in part:

(a) Subject to the hearing provisions of § 4–318 of this subtitle, the Board may deny a general license to practice dentistry, a limited license to practice dentistry, or a teacher's license to practice dentistry to any applicant, reprimand any licensed dentist, place any licensed dentist on probation, or suspend or revoke the license of any licensed dentist, if the applicant or licensee:

\* \* \*

(6) Practices dentistry in a professionally incompetent manner or in a grossly incompetent manner;

\* \* \*

(11) Permits an unauthorized individual to practice dentistry under the supervision of the applicant or licensee;

\* \* \*

(16) Behaves dishonorably or unprofessionally, or violates a professional code of ethics pertaining to the dentistry profession;

\* \* \*

(18) Violates any rule or regulation adopted by the Board;

\* \* \*

(20) Willfully makes or files a false report or record in the practice of dentistry;

\* \* \*

(28) Except in an emergency life-threatening situation where it is not feasible or practicable, fails to comply with the Centers for Disease Control's guidelines on universal precautions;

Rosov was charged with violations of all of the provisions indicated above.

The Board ultimately held:

Dr. Rosov has had many opportunities to learn, and successfully overcome, what can only be described as a somewhat cavalier attitude toward compliance with CDC protections for the benefit of his patients and staff. The Board has tried incremental discipline and found that it has not achieved salutary results. Dr. Rosov has been subject to prior Board discipline: In 1998, he entered into a Consent Order in which he was placed on probation for 3 years for conduct that included the failure to record treatments properly; he was summarily suspended in October 2002, as detailed above, and was summarily suspended again in July 2003. Even in the absence of such a dismal history, the facts adduced at the hearing on the instant charges would be sufficient bases for revocation of a license to practice dentistry.

The Board notes that this case involves not just the double stick incident. Although that incident is disturbing,

the Board finds even more distressing the conduct of Dr. Rosov subsequent to the incident. Despite his latter day "insight" that perhaps the needle stick incident never occurred, he acknowledges that he believed for a significant period that it *had* occurred just as [Hickman] stated, and it is supported by a preponderance of the evidence. Nonetheless, he failed to act appropriately, as set out above in the Proposed Decision. He failed to contact Patient A's mother expeditiously, failed to give her accurate information regarding the incident, did not maintain appropriate records, and in fact still could not produce them almost 3 months later at the time of Dr. Mulreany's inspection. He misrepresented to the Board his attempts to contact Patient A's mother, and the outcome of [Hickman]'s blood tests. In short, regardless of the facts surrounding the events of February 26, the Board simply cannot countenance Dr. Rosov's actions related to the incident in the days, weeks, and months thereafter.

In addition, the Board has taken into consideration Dr. Rosov's failure to document his treatment properly, as well as the sheer breadth and repetitive nature of Dr. Rosov's failure to comply with CDC guidelines regarding universal precautions.

Finally, the Board has considered Dr. Rosov's lack of direct supervision of his dental assistants in the placement and exposure of radiographs when the assistants were not certified by the Board as dental radiation technologists and were not acting in accordance with an educational program approved by the Board.

The inescapable conclusion is that the Board must take action to remove Dr. Rosov from the practice of dentistry for protection of the public health. Nothing in the record mitigates this conclusion. Nothing in the record suggests that the Board should accept, once again, Dr. Rosov's assurances that he will improve and thus should be given yet one more opportunity to demonstrate his willingness or ability to do so.

## The Needle Stick

We have earlier summarized the needle stick incident, and pointed out that Rosov's brief focuses almost solely on that event, to the exclusion of the other charges. We shall now provide more detail of that event.

Rosov argues that his first notice of the needle stick came the day after the incident when Hickman informed him.[11] No communication between Rosov and Patient A's mother occurred until nearly one week later, when she received a letter from him, dated March 4, 2003. In that letter, Rosov advised the mother that, after treating Patient A, the disposable needle that he had previously used on Patient A had inadvertently pricked the leg of his dental assistant. Specifically, he advised that Patient A "was at absolutely no risk, this happened well after she was injected and then the needle was disposed." Indeed, Patient A's mother testified that her first notice of the incident was one week after it occurred when she received a letter suggesting that her daughter should be tested as a safeguard to Hickman.

The mother telephoned Rosov's office and read the letter to Hickman, who explained that the needle stick had actually occurred the other way around, that is, the needle stuck Hickman *first*, and then Patient A. Understandably upset, the mother spoke with Rosov, who informed her that it was "a possibility" that the needle stuck Hickman first and then the child. Rosov then arranged for Patient A to receive lab referrals for the appropriate blood tests.

The matter came to the Board's attention on April 16, 2003, as the result of a newspaper article that reported the incident. The Board then acted to initiate a complaint and referred the case for investigation.

---

**11.** Rosov takes issue with Hickman's failure to inform Patient A's mother at the time. This argument is irrelevant, as Rosov's responsibilities to his patient, not an assistant's, are at issue. Additionally, Rosov's claim that Hickman "did not act like someone who had been stuck with a contaminated needle" is self-serving.

Curiously, in Rosov's exceptions to the findings of the ALJ, he claimed the needle stick had never occurred. The Board found:

In objecting to this Finding Dr. Rosov argues somewhat inconsistently that the needle stick of employee [Hickman] never occurred and that he was unaware of the incident. The Board rejects both assertions based on a review of the testimony of all witnesses as well as other record evidence. A comprehensive analysis of the evidence supports the credibility assessments made by the ALJ, particularly with regard to the testimony of [Hickman], Dr. Rosov, and another dental assistant, [Howard]. As noted below, the Board adopts the discussion and analysis of the ALJ regarding the circumstances surrounding this incident. Dr. Rosov's allegation that the needle stick of [Hickman] never occurred is simply too implausible to credit. It is wholly inconsistent with his own actions, including writing two different letters to Patient A's mother on March 4 and March 6 [The handwritten letters provide two different accounts of the incident, but neither questions that assistant Hickman was stuck with the same needle used on the minor patient], calling his wife for advice on the proper precautions to follow in seeking treatment and testing for Patient A and employee [Hickman], and advising CDC consultant Dr. Mulreany of the event. His subsequently developing theory that perhaps the incident never occurred at all is simply not consistent with his behaviors or those of his employees, [Hickman] and [Howard]. The apparent inconsistencies in the testimony of [Howard] offer Dr. Rosov no solace. Taken as a whole, the various statements of [Howard] amount to, even when considered in the light most favorable to Dr. Rosov, hedging by the employee as to whether Dr. Rosov actually knew of the needle stick at the time it occurred.

(Footnote omitted).

After the incident came to the attention of the Board, Dr. Mulreany, on May 5, 2003, inspected Rosov's office. Rosov was unable to produce records from the February 26, 2003,

needle stick incident, including records regarding notification to or testing of either Patient A or Hickman. Rosov later sent Dr. Mulreany copies of his letters, and lab reports for Hickman and Patient A. Although Rosov's records were subpoenaed by the Board on May 15, 2003, he did not submit a copy of the March 4, 2003, letter that had been sent to Patient A's mother.

Even though Hickman's blood tests revealed "REPEATEDLY REACTIVE" for Hepatitis C Virus, Rosov wrote to the Board on May 21, 2003, that "he had negative test results" from his assistant. Additionally, Rosov wrote:

After being informed the next day about Miss Hickman's needle stick, we jointly referred to our OSHA manual and I advised Miss Hickman to get a blood test for possible HIV/Hepatitis. I called the patient's mother and similarly informed her of the incident and requested that her daughter also have the precautionary blood tests.

In fact, as noted by the ALJ in reviewing the mother's testimony, Rosov did not speak to the mother of Patient A before his letter of March 4, 2003.

The ALJ's finding, by a preponderance of the evidence, that the needle stick occurred was based, in part, on the testimony of Howard, Rosov's dental assistant. She saw Rosov pull the needle away from Patient A's mouth as she began to struggle, lowering it to his right side. As this occurred, she heard Hickman say "ouch," and assumed Rosov knew he had stuck Hickman. Howard also recalled that when Hickman came out of the bathroom later that day, she informed Howard that she had a red mark on her leg. Howard did not see the mark. The ALJ concluded that Howard's testimony alone supported a finding that the needle stick occurred.[12] The corroboration of the facts by Hickman added to the weight of Howard's

---

12. The ALJ acknowledged that Howard offered a contradictory account of the incident in a later affidavit provided to Rosov's counsel. However, the ALJ noted that this account was tainted, because it was given after Howard received a $1,000 bonus from Rosov, in addition to a paid Caribbean cruise and diamond earrings as a Christmas gift.

testimony.[13] Rosov himself later admitted he remembered "brushing" Hickman's leg, but he did not hear her say "ouch," explaining that he is deaf in one ear, and the room was noisy at the time. We find no error in the ALJ's factual finding that the needle stick occurred. We also note that the ALJ had the opportunity to observe the witnesses, to judge their credibility, and to make demeanor-based credibility assessments in view of the conflicting evidence.

Rosov's conduct after the needle stick is also at issue. We concur with the ALJ's finding that, after learning of the incident, Rosov should have taken appropriate steps to ascertain the facts, make required chart entries, file appropriate reports, and fully and adequately explain the situation to those involved. His actions in response to the incident were not appropriate, nor did they follow proper post-exposure procedure. There was sufficient evidence that Rosov's behavior failed to comply with CDC guidelines regarding disease transmission and blood-borne pathogens, in violation of § 4–315(a)(28) of the Health Occupation Article. *See also* 29 C.F.R. 1910.1030. Further, there is more than sufficient evidence that Rosov violated § 4–315(a) by providing misleading information to both Kimberly Hickman and Patient A's mother.

### The Remaining Violations

Rosov claims that the Board's investigation was based entirely on the statements of Kimberly Hickman, which, as we have explained, he claims to be not credible. He places significance on the fact that neither Patient A nor her mother filed a complaint with the Board against him. We fail to discern how the basis of the Board's initial knowledge would attenuate the violations, in view of the substantial evidence of his inappropriate management of his professional obligations. Neither does it render insignificant Rosov's continuous violations of the Maryland Dentistry Act and CDC guidelines.

---

13. Hickman testified that after being stuck she fell to one knee, in addition to saying "ouch." Howard disputed that testimony.

Rosov further asserts that the Board was predisposed to revoke his license throughout the investigation, "twist[ing] employee and expert statements" to find support for their intentions. Those assertions, while perhaps suitable for closing argument to a jury, were lost on the ALJ, as they are lost on this Court. The record is devoid of evidence that supports his assignment of enmity by the Board as the basis for its action.

Rosov also places significance on the fact that, at the time of this investigation, he was no longer on probation. Nonetheless, he was under a continuing order requiring inspections. Those inspections and the findings were a basis of the charges against him, in addition to the needle stick incident. The current charges were no doubt spurred by the needle stick incident, but the investigation disclosed evidence to sustain the myriad of other charges.

In arguing that admission of Rosov's prior charges would prejudice the fact finder, the following ensued:

[COUNSEL FOR ROSOV]: I would ask counsel to articulate to Your Honor what it is, which of these orders does she contend that he violated in these charges?

[ALJ]: It's my understanding that after looking at the charges that a violation of a prior order is not one of the bases for the—

[THE STATE]: The State is not charging the respondent with, quote, a violation of a prior order.

[ALJ]: The basis is, and again, I'm not making a finding but here's the allocation, that is based on conduct from the October 2 consent order up to the charging document in this case. Is that correct?

[THE STATE]: That's correct, Your Honor. In fact, [counsel for Rosov] has indicated that following the October summary suspension that he had no restrictions on his license, albeit he was no longer on probation **but he was under an order requiring ongoing inspections. And those inspections and its findings are a basis of these charges so clearly it's relevant.**

[COUNSEL FOR ROSOV]: I don't have any objection to—those are in the final order of November 20, 2002, final decision and order, that the inspections and unannounced visits and that had—I'm not objecting.

What I'm objecting to is everything that came before that, 1998, 1996, the termination of his probation, the summary suspension in October, and the transcript of the Show Cause hearing in October.

(Emphasis added.)

We do not find it necessary to repeat, in exquisite detail, the factual findings of the ALJ, and adopted by the Board, as to the charges unrelated to the needle stick. Nowhere in his arguments to this Court has Rosov contradicted the findings of the ALJ to any of the other charges. The record is replete with evidence that Rosov knowingly made false reports, provided misleading information to the Board, violated numerous CDC guidelines, and continued irresponsible and unsanitary practices for which he had previously been disciplined. His dramatic accusatory language, demeaning the motives of the Board, is factually unsupported, and gives no basis for favorable appellate review of his license revocation.

We find, as did the circuit court, that the ALJ's decision was supported by substantial evidence, and that a reasoning mind could reasonably have reached the agency's factual conclusion. We affirm.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED; COSTS ASSESSED TO APPELLANT.**